## TELEPROMPTER CORP. et al. v. COLUMBIA BROADCASTING SYSTEM, INC., et al.

No. 72–1628. Argued January 7, 1974—Decided March 4, 1974*

---

*Together with No. 72–1633, *Columbia Broadcasting System, Inc., et al.* v. *Teleprompter Corp. et al.,* also on certiorari to the same court.

STEWART, J., delivered the opinion of the Court, in which BREN-NAN, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. BLACKMUN, J., filed an opinion dissenting in part, *post*, p. 415. DOUGLAS, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post*, p. 416.

*Robert C. Barnard* argued the cause for petitioners in No. 72–1628 and for respondents in No. 72–1633. With him on the briefs were *R. Michael Duncan, Charles F. Lettow*, and *David Z. Rosensweig*.

*Asa D. Sokolow* and *Seymour Graubard* argued the cause for respondents in No. 72–1628 and for petitioners in No. 72–1633. With them on the briefs were *Charles H. Miller, Royal E. Blakeman, Bertrand H. Weidberg*, and *Eugene Z. DuBose*.†

MR. JUSTICE STEWART delivered the opinion of the Court.

The plaintiffs in this litigation, creators and producers of televised programs copyrighted under the provisions of the Copyright Act of 1909, as amended, 17 U. S. C. § 1 *et seq.*, commenced suit in 1964 in the United States District Court for the Southern District of New York, claiming that the defendants had infringed their copyrights by intercepting broadcast transmissions of copy-

---

†*Steven R. Rivkin* and *Peter H. Schuck* filed a brief for the Consumers Union of the United States, Inc., et al., as *amici curiae* in both cases. Briefs of *amici curiae* in No. 72–1628 were filed by *Bernard G. Segal, Ira P. Tiger*, and *Corydon B. Dunham* for the National Broadcasting Co., Inc.; by *Stuart Feldstein* and *Stephen A. Gold* for the National Cable Television Assn.; by *Irwin Karp* for the Authors League of America, Inc.; by *Paul P. Selvin, William Berger*, and *William B. Haughton* for the Writers Guild of America et al.; and by *Louis Nizer, Gerald Meyer, Gerald F. Phillips, Arthur Scheiner*, and *Robert D. Hadl* for the Motion Picture Association of America, Inc., et al. *Herman Finkelstein* filed a brief for the American Society of Composers, Authors, and Publishers as *amicus curiae* in No. 72–1633.

righted material and rechanneling these programs through various community antenna television (CATV) systems to paying subscribers.[1] The suit was initially

---

[1] The exclusive rights of copyright owners are specified in § 1 of the Copyright Act:

"Any person entitled thereto, upon complying with the provisions of this title, shall have the exclusive right:

"(a) To print, reprint, publish, copy, and vend the copyrighted work;

"(b) To translate the copyrighted work into other languages or dialects, or make any other version thereof, if it be a literary work; to dramatize it if it be a nondramatic work; to convert it into a novel or other nondramatic work if it be a drama; to arrange or adapt it if it be a musical work; to complete, execute, and finish it if it be a model or design for a work of art;

"(c) To deliver, authorize the delivery of, read, or present the copyrighted work in public for profit if it be a lecture, sermon, address or similar production, or other nondramatic literary work; to make or procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, delivered, presented, produced, or reproduced; and to play or perform it in public for profit, and to exhibit, represent, produce, or reproduce it in any manner or by any method whatsoever. The damages for the infringement by broadcast of any work referred to in this subsection shall not exceed the sum of $100 where the infringing broadcaster shows that he was not aware that he was infringing and that such infringement could not have been reasonably foreseen; and

"(d) To perform or represent the copyrighted work publicly if it be a drama or, if it be a dramatic work and not reproduced in copies for sale, to vend any manuscript or any record whatsoever thereof; to make or to procure the making of any transcription or record thereof by or from which, in whole or in part, it may in any manner or by any method be exhibited, performed, represented, produced, or reproduced; and to exhibit, perform, represent, produce, or reproduce it in any manner or by any method whatsoever; and

"(e) To perform the copyrighted work publicly for profit if it be a musical composition; and for the purpose of public performance for profit, and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it

stayed by agreement of the parties, pending this Court's decision in *Fortnightly Corp.* v. *United Artists Television*, 392 U. S. 390. In that case, decided in 1968, we held that the reception and distribution of television broadcasts by the CATV systems there involved did not constitute a "performance" within the meaning of the Copyright Act, and thus did not amount to copyright infringement.[2] After that decision the plaintiffs in the present litigation filed supplemental pleadings in which they sought to distinguish the five CATV systems challenged here from those whose operations had been found not to constitute copyright infringement in *Fortnightly*.[3] The District Court subsequently dismissed the complaint on the ground that the plaintiffs' cause of action was barred by the *Fortnightly* decision. 355 F. Supp. 618. On appeal to the United States Court of Appeals for the

---

in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced . . . ." 17 U. S. C. § 1.

[2] Although the Copyright Act does not contain an explicit definition of infringement, it is settled that unauthorized use of copyrighted material inconsistent with the "exclusive rights" enumerated in § 1, constitutes copyright infringement under federal law. See 1 M. Nimmer, Copyright § 100, p. 376 (1973). Use of copyrighted material not in conflict with a right secured by § 1, however, no matter how widespread, is not copyright infringement. "The fundamental [is] that 'use' is not the same thing as 'infringement,' that use short of infringement is to be encouraged . . . ." B. Kaplan, An Unhurried View of Copyright 57 (1967).

It appears to be conceded that liability in this case depends entirely on whether the defendants did "perform" the copyrighted works. Teleprompter has not contended in this Court that, if it did "perform" the material, its performance was not "in public" within the meaning of § 1 (c) of the Act (nondramatic literary works) or "publicly" under § 1 (d) (dramatic works). Cf. *Fortnightly Corp.* v. *United Artists Television*, 392 U. S. 390, 395 n. 13.

[3] The plaintiffs' amended complaints also contained allegations of additional copyright infringements on various dates in 1969 and 1971.

Second Circuit, the judgment was affirmed in part and reversed in part, and the case was remanded to the District Court for further proceedings. 476 F. 2d 338. Both the plaintiffs and the defendants petitioned for certiorari, and, because of the seemingly important questions of federal law involved, we granted both petitions. 414 U. S. 817.

I

The complaint alleged that copyright infringements occurred on certain dates at each of five illustrative CATV systems located in Elmira, New York; Farmington, New Mexico; Rawlins, Wyoming; Great Falls, Montana; and New York City. The operations of these systems typically involved the reception of broadcast beams by means of special television antennae owned and operated by Teleprompter, transmission of these electronic signals by means of cable or a combination of cable and point-to-point microwave [4] to the homes of

---

[4] The Court of Appeals in this case described the differences between point-to-point microwave transmission and broadcasting in the following terms:

"A microwave link involves the transmission of signals through the air. However, microwave transmission in itself is not broadcasting. A broadcast signal, according to 47 U. S. C. § 153 (o), is transmitted by a broadcaster for '[reception] by the public.' In the case of microwave, the signal is focused and transmitted in a narrow beam aimed with precision at the receiving points. Thus, microwave transmission is point-to-point communication. The receiving antenna must be in the path of the signal beam. If the transmission must cover a considerable distance, the microwave signal is transmitted to the first receiving point from which it is retransmitted to another receiving point, and this process is repeated until the signal reaches the point from which it is distributed by cable to subscribers." 476 F. 2d 338, 343 n. 6.

The plaintiffs argued in the District Court and in the Court of Appeals that "the use of microwave, in and of itself, is sufficient to make a CATV system functionally equivalent to a broadcaster

subscribers, and the conversion of the electromagnetic signals into images and sounds by means of the subscribers' own television sets.[5] In some cases the distance between the point of original transmission and the ultimate viewer was relatively great—in one instance more than 450 miles—and reception of the signals of those stations by means of an ordinary rooftop antenna, even an extremely high one, would have been impossible because of the curvature of the earth and other topographical factors. In others, the original broadcast was relatively close to the customers' receiving sets and could normally have been received by means of standard television equipment. Between these extremes were systems involving intermediate distances where the broadcast signals could have been received by the customers' own television antennae only intermittently, imperfectly, and sporadically.[6]

Among the various actual and potential CATV operations described at trial the Court of Appeals discerned,

---

and thus subject to copyright liability . . . ." *Id.*, at 348–349. This contention was rejected by the Court of Appeals on the ground that microwave transmission "is merely an alternative, more economical in some circumstances, to cable in transmitting a broadcast signal from one point in a CATV system to another," *id.*, at 349, and the argument has not been renewed in this Court.

[5] For general descriptions of CATV systems and their operation, see *United States* v. *Southwestern Cable Co.*, 392 U. S. 157; M. Seiden, An Economic Analysis of Community Antenna Television Systems and the Television Broadcasting Industry (1965); Note, Regulation of Community Antenna Television, 70 Col. L. Rev. 837 (1970); Note, The Wire Mire: The FCC and CATV, 79 Harv. L. Rev. 366 (1965).

[6] In two of the cities involved in this suit signals not normally receivable by household sets because of distance or terrain could be received by rooftop antennae because of the use by the broadcasting stations of "translators," under license from the Federal Communications Commission, which rebroadcast a specific station's signals. See 476 F. 2d, at 344 and n. 7.

for copyright purposes, two distinct categories. One category included situations where the broadcast signal was already "in the community" served by a CATV system, and could be received there either by standard rooftop or other antennae belonging to the owners of television sets or by a community antenna erected in or adjacent to the community. Such CATV systems, the court found, performed essentially the same function as the CATV systems in *Fortnightly* in that they "no more than enhance the viewer's capacity to receive the broadcaster's signals," 392 U. S., at 399. The second category included situations where the CATV systems imported "distant" signals from broadcasters so far away from the CATV community that neither rooftop nor community antennae located in or near the locality could normally receive signals capable of providing acceptable images.

The Court of Appeals determined that "[w]hen a CATV system is performing this second function of distributing signals that are beyond the range of local antennas, . . . to this extent, it is functionally equivalent to a broadcaster and thus should be deemed to 'perform' the programming distributed to subscribers on these imported signals." 476 F. 2d, at 349. The Court of Appeals found that in two of the operations challenged in the complaint—those in Elmira and New York City—the signals received and rechanneled by the CATV systems were not "distant" signals, and as to these claims the court affirmed the District Court's dismissal of the complaint. As to the three remaining systems, the case was remanded for further findings in order to apply the appellate court's test for determining whether or not the signals were "distant." [7] In No. 72–1633 the plaintiffs

---

[7] The Court of Appeals acknowledged that a determination of what is a "distant" signal was "difficult," and "that a precise judicial definition of a distant signal is not possible." 476 F. 2d, at 350. FCC

ask this Court to reverse the determination of the Court of Appeals that CATV reception and retransmission of signals that are not "distant" do not constitute copyright infringement. In No. 72–1628, the defendants ask us to reverse the appellate court's determination that reception and retransmission of "distant" signals amount to a "performance," and thus constitute copyright infringement on the part of the CATV systems.

## II

We turn first to the assertions of the petitioners in No. 72–1633 that irrespective of the distance from the broadcasting station, the reception and retransmission of its signal by a CATV system constitute a "performance" of a copyrighted work. These petitioners contend that a number of significant developments in the technology and actual operations of CATV systems mandate a reassessment of the conclusion reached in *Fortnightly* that CATV systems act only as an extension of a tele-

---

regulations at one time provided that for regulatory purposes a distant signal was one "which is extended or received beyond the Grade B contour of that station." 47 CFR § 74.1101 (i) (1971) (removed in 37 Fed. Reg. 3278 (1972)). A Grade B contour was defined as a line along which good reception may be expected 90% of the time at 50% of the locations. *United States* v. *Southwestern Cable Co., supra*, at 163 n. 16. The Court of Appeals recognized that "this definition [is] unsuitable for copyright purposes because . . . any definition phrased in terms of what can be received in area homes using rooftop antennas would fly in the face of the mandate of *Fortnightly*." 476 F. 2d, at 350. The court found instead that "it is easier to state what is not a distant signal than to state what is a distant signal. Accordingly, we have concluded that any signal capable of projecting, without relay or retransmittal, an acceptable image that a CATV system receives off-the-air during a substantial portion of the time by means of an antenna erected in or adjacent to the CATV community is not a distant signal." *Id.*, at 351 (footnote omitted).

vision set's function of converting into images and sounds the signals made available by the broadcasters to the public. In *Fortnightly* this Court reviewed earlier cases in the federal courts and determined that while analogies to the functions of performer and viewer envisioned by the Congress in 1909—that of live or filmed performances watched by audiences—were necessarily imperfect, a simple line could be drawn: "Broadcasters perform. Viewers do not perform." 392 U. S., at 398 (footnotes omitted). Analysis of the function played by CATV systems and comparison with those of broadcasters and viewers convinced the Court that CATV systems fall "on the viewer's side of the line." *Id.,* at 399 (footnote omitted).

> "The function of CATV systems has little in common with the function of broadcasters. CATV systems do not in fact broadcast or rebroadcast. Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers. We hold that CATV operators, like viewers and unlike broadcasters, do not perform the programs that they receive and carry." *Id.,* at 400–401 (footnotes omitted).

The petitioners claim that certain basic changes in the operation of CATV systems that have occurred since *Fortnightly* bring the systems in question here over to the broadcasters' "side of the line." In particular, they emphasize three developments that have taken place in the few years since the *Fortnightly* decision. First, they point out that many CATV systems, including some of

those challenged here, originate programs wholly independent of the programs that they receive off-the-air from broadcasters and rechannel to their subscribers.[8] It is undisputed that such CATV systems "perform" those programs which they produce and program on their own; but it is contended that, in addition, the engagement in such original programing converts the entire CATV operation into a "broadcast function," and thus a "performance" under the Copyright Act. Second, these petitioners assert that Teleprompter, unlike the CATV operators sued in *Fortnightly,* sells advertising time to commercial interests wishing to sell goods or services in the localities served by its CATV systems. The sale of such commercials, they point out, was considered in the *Fortnightly* opinion as a function characteristically performed by broadcasters. *Id.,* at 400 n. 28, citing *Intermountain Broadcasting & Television Corp.* v. *Idaho Microwave, Inc.,* 196 F. Supp. 315, 325. Finally, they contend that by engaging in interconnection with other CATV systems—whereby one CATV system that originates a program sells the right to redistribute it to other CATV systems that carry it simultaneously to their own subscribers—the CATV operators have similarly transferred their functions into that of broadcasters, thus subjecting themselves to copyright infringement liability.[9]

---

[8] Program origination initially consisted of simple arrangements on spare channels using automated cameras providing time, weather, news ticker, or stock ticker information, and aural systems with music or news announcements. The function has been expanded to include coverage of sports and other live events, news services, moving picture films, and specially created dramatic and nondramatic programs. See CATV-First Report and Order, 20 F. C. C. 2d 201; *United States* v. *Midwest Video Corp.,* 406 U. S. 649.

[9] The Court of Appeals limited its discussion of interconnection among CATV systems to two instances of live coverage of championship heavyweight boxing contests. While the respondents contend

The copyright significance of each of these functions—program origination, sale of commercials, and interconnection—suffers from the same logical flaw: in none of these operations is there any nexus with the defendants' reception and rechanneling of the broadcasters' copyrighted materials. As the Court of Appeals observed with respect to program origination, "[e]ven though the origination service and the reception service are sold as a package to the subscribers, they remain separate and different operations, and we cannot sensibly say that the system becomes a 'performer' of the broadcast programming when it offers both origination and reception services, but remains a nonperformer when it offers only the latter." 476 F. 2d, at 347. Similarly, none of the programs accompanying advertisements sold by CATV or carried via an interconnection arrangement among CATV systems involved material copyrighted by the petitioners.[10]

For these reasons we hold that the Court of Appeals was correct in determining that the development and implementation of these new functions, even though they may allow CATV systems to compete more effectively with the broadcasters for the television market, are simply extraneous to a determination of copyright infringement liability with respect to the reception and retransmission of broadcasters' programs.

---

that additional examples of interconnection were presented in the trial testimony, they do not suggest that material copyrighted by anyone other than the CATV operators was carried by any such interconnection, and thus the exact number of such instances is of no significance.

[10] While the technology apparently exists whereby a CATV system could retransmit to its subscribers broadcast programs taken off-the-air but substitute its own commercials for those appearing in the broadcast, none of the instances of claimed infringement involved such a process.

## III

In No. 72–1628 Teleprompter and its subsidiary, Conley Electronics Corp., seek a reversal of that portion of the Court of Appeals' judgment that determined that the importation of "distant" signals from one community into another constitutes a "performance" under the Copyright Act. In concluding that rechanneling of "distant" signals constitutes copyright infringement while a similar operation with respect to more nearby signals does not, the court relied in part on a description of CATV operations contained in this Court's opinion in *United States* v. *Southwestern Cable Co.,* 392 U. S. 157, announced a week before the decision in *Fortnightly:*

> "CATV systems perform either or both of two functions. First, they may supplement broadcasting by facilitating satisfactory reception of local stations in adjacent areas in which such reception would not otherwise be possible; and second, they may transmit to subscribers the signals of distant stations entirely beyond the range of local antennae." *Id.,* at 163.

The Court in *Southwestern Cable,* however, was faced with conflicting assertions concerning the jurisdiction of the Federal Communications Commission to regulate in the public interest the operations of CATV systems. Insofar as the language quoted had other than a purely descriptive purpose, it was related only to the issue of regulatory authority of the Commission. In that context it did not and could not purport to create any separation of functions with significance for copyright purposes.[11]

---

[11] The FCC has consistently contended that it is without power to alter rights emanating from other sources, including the Copyright Act. In 1966 it indicated that its proposed rules regulating CATV

In the briefs and at oral argument various rationales for the distinction adopted by the Court of Appeals have been advanced. The first, on which the court itself relied, is the assertion that by importing signals from distant communities the CATV systems do considerably more than "enhance the viewer's capacity to receive the broadcaster's signals," *Fortnightly*, 392 U. S., at 399, and instead "bring signals into the community that would not otherwise be receivable on an antenna, even a large community antenna, erected in that area." 476 F. 2d, at 349. In concluding that such importation transformed the CATV systems into performers, the Court of Appeals misconceived the thrust of this Court's opinion in *Fortnightly*.

In the *Fortnightly* case the Court of Appeals had concluded that a determination of whether an electronic function constituted a copyright "performance" should depend on "how much did the [CATV system] do to bring about the viewing and hearing of a copyrighted

---

operations would not "affect in any way the pending copyright suits, involving as they do matters entirely beyond [the FCC's] jurisdiction." Second Report and Order, Community Antenna Television Systems, 2 F. C. C. 2d 725, 768. This position is consistent with the terms of the Communications Act of 1934, the source of the Commission's regulatory power, which provides, in part:

"Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies." 47 U. S. C. § 414.

Thus, it is highly unlikely that the "distant" signal definition adopted by the Commission or a differentiation of function based on such a definition was intended to or could have copyright significance. Indeed, as noted, the Court of Appeals in the present case found that the Commission's definition of a "distant" signal was unsatisfactory for determining if a "performance" under the Copyright Act had occurred. See n. 7, *supra*.

work." 377 F. 2d 872, 877. This quantitative approach was squarely rejected by this Court:

> "[M]ere quantitative contribution cannot be the proper test to determine copyright liability in the context of television broadcasting. . . . Rather, resolution of the issue before us depends upon a determination of the function that CATV plays in the total process of television broadcasting and reception." 392 U. S., at 397.

By importing signals that could not normally be received with current technology in the community it serves, a CATV system does not, for copyright purposes, alter the function it performs for its subscribers. When a television broadcaster transmits a program, it has made public for simultaneous viewing and hearing the contents of that program. The privilege of receiving the broadcast electronic signals and of converting them into the sights and sounds of the program inheres in all members of the public who have the means of doing so. The reception and rechanneling of these signals for simultaneous viewing is essentially a viewer function, irrespective of the distance between the broadcasting station and the ultimate viewer.

In *Fortnightly* the Court reasoned that "[i]f an individual erected an antenna on a hill, strung a cable to his house, and installed the necessary amplifying equipment, he would not be 'performing' the programs he received on his television set," *id.*, at 400, and concluded that "[t]he only difference in the case of CATV is that the antenna system is erected and owned not by its users but by an entrepreneur." *Ibid.* In the case of importation of "distant" signals, the function is essentially the same. While the ability or inclination of an individual to erect his own antenna might decrease with respect to distant signals because of the increased cost of bringing

the signal to his home, his status as a "nonperformer" would remain unchanged.  Similarly, a CATV system does not lose its status as a nonbroadcaster, and thus a "nonperformer" for copyright purposes, when the signals it carries are from distant rather than local sources.

It is further argued that when a CATV operator increases the number of broadcast signals that it may receive and redistribute, it exercises certain elements of choice and selection among alternative sources and that this exercise brings it within scope of the broadcaster function.  It is pointed out that some of the CATV systems importing signals from relatively distant sources could with equal ease and cost have decided to import signals from other stations at no greater distance from the communities they serve.  In some instances, the CATV system here involved "leapfrogged" nearer broadcasting stations in order to receive and rechannel more distant programs.[12]  By choosing among the alternative broadcasting stations, it is said, a CATV system functions much like a network affiliate which chooses the mix of national and local program material it will broadcast.

The distinct functions played by broadcasters and CATV systems were described in *Fortnightly* in the following terms:

> "Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive.  Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to

---

[12] For example, it was represented in a brief before this Court that the Farmington, New Mexico, CATV system imported signals from a Los Angeles station even though 113 other stations were closer or equidistant, including a number which, unlike the Los Angeles station, were in the same time zone as the Farmington community.

the public and carry them by private channels to additional viewers." *Id.*, at 400.

Even in exercising its limited freedom to choose among various broadcasting stations, a CATV operator simply cannot be viewed as "selecting," "procuring," or "propagating" broadcast signals as those terms were used in *Fortnightly.* When a local broadcasting station selects a program to be broadcast at a certain time, it is exercising a creative choice among the many possible programs available from the national network with which it is affiliated, from copyright holders of new or rerun motion pictures, or from its own facilities to generate and produce entirely original program material. The alternatives are myriad, and the creative possibilities limited only by scope of imagination and financial considerations. An operator of a CATV system, however, makes a choice as to which broadcast signals to rechannel to its subscribers, and its creative function is then extinguished. Thereafter it "simply carr[ies], without editing, whatever programs [it] receive[s]." *Ibid.* Moreover, a CATV system importing "distant" signals does not procure programs and propagate them to the public, since it is not engaged in converting the sights and sounds of an event or a program into electronic signals available to the public. The electronic signals it receives and rechannels have already been "released to the public" even though they may not be normally available to the specific segment of the public served by the CATV system.

Finally, it is contended that importation of "distant" signals should entail copyright infringement liability because of the deleterious impact of such retransmission upon the economics and market structure of copyright licensing. When a copyright holder first licenses a copyrighted program to be shown on broadcast television, he

typically cannot expect to recoup his entire investment from a single broadcast. Rather, after a program has had a "first run" on the major broadcasting networks, it is often later syndicated to affiliates and independent stations for "second run" propagation to secondary markets. The copyright holders argue that if CATV systems are allowed to import programs and rechannel them into secondary markets they will dilute the profitability of later syndications, since viewer appeal, as measured by various rating systems, diminishes with each successive showing in a given market. We are told that in order to ensure "the general benefits derived by the public from the labors of authors," *Fox Film Corp.* v. *Doyal,* 286 U. S. 123, 127, and " 'the incentive to further efforts for the same important objects,' " *id.,* at 127–128, citing *Kendall* v. *Winsor,* 21 How. 322, 328, current licensing relationships must be maintained.

In the television industry, however, the commercial relations between the copyright holders and the licensees on the one hand and the viewing public on the other are such that dilution or dislocation of markets does not have the direct economic or copyright significance that this argument ascribes to it. Unlike propagators of other copyrighted material, such as those who sell books, perform live dramatic productions, or project motion pictures to live audiences, holders of copyrights for television programs or their licensees are not paid directly by those who ultimately enjoy the publication of the material—that is, the television viewers—but by advertisers who use the drawing power of the copyrighted material to promote their goods and services. Such advertisers typically pay the broadcasters a fee for each transmission of an advertisement based on an estimate of the expected number and characteristics of the viewers who will watch the program. While, as members of the

general public, the viewers indirectly pay for the privilege of viewing copyrighted material through increased prices for the goods and services of the advertisers, they are not involved in a direct economic relationship with the copyright holders or their licensees.[13]

By extending the range of viewability of a broadcast program, CATV systems thus do not interfere in any traditional sense with the copyright holders' means of extracting recompense for their creativity or labor. When a broadcaster transmits a program under license from the copyright holder he has no control over the segment of the population which may view the program— the broadcaster cannot beam the program exclusively to the young or to the old, only to women or only to men— but rather he gets paid by advertisers on the basis of all viewers who watch the program. The use of CATV does not significantly alter this situation. Instead of basing advertising fees on the number of viewers within the range of direct transmission plus those who may receive "local signals" via a CATV system, broadcasters whose reception ranges have been extended by means of "distant" signal CATV rechanneling will merely have a different and larger viewer market.[14] From the point of

---

[13] Some commentators have suggested that if CATV systems must pay license fees for the privilege of retransmitting copyrighted broadcast programs, the CATV subscribers will in effect be paying twice for the privilege of seeing such programs: first through increased prices for the goods and services of the advertisers who pay for the television broadcasts and a second time in the increased cost of the CATV service. Note, CATV and Copyright Liability: On .a Clear Day You Can See Forever, 52 Va. L. Rev. 1505, 1515 (1966); Note, CATV and Copyright Liability, 80 Harv. L. Rev. 1514, 1522–1523 (1967). See n. 15, infra.

[14] Testimony and exhibits introduced in the District Court indicate that the major rating services cover in their compilations statistics concerning the entire number of viewers of a particular program, including those who receive the broadcast via "distant" transmission

view of the broadcasters, such market extension may mark a reallocation of the potential number of viewers each station may reach, a fact of no direct concern under the Copyright Act. From the point of view of the copyright holders, such market changes will mean that the compensation a broadcaster will be willing to pay for the use of copyrighted material will be calculated on the basis of the size of the direct broadcast market augmented by the size of the CATV market.[15]

over CATV systems. The weight given such statistics by advertisers who bid for broadcast time and pay the fees which support the broadcasting industry was not, however, established. See n. 15, *infra.*

[15] It is contended that copyright holders will necessarily suffer a net loss from the dissemination of their copyrighted material if license-free use of "distant" signal importation is permitted. It is said that importation of copyrighted material into a secondary market will result in a loss in the secondary market without increasing revenues from the extended primary market on a scale sufficient to compensate for that loss. The assumption is that local advertisers supporting "first run" programs will be unlikely to pay significantly higher fees on the basis of additional viewers in a "distant" market because such viewers will typically have no commercial interest in the goods and services sold by purely local advertisers. For discussion of the possible impact of CATV "distant" signal importation on advertiser markets for broadcast television, see 52 Va. L. Rev., at 1513–1516; 80 Harv. L. Rev., at 1522–1525. The Court of Appeals noted that "[n]o evidence was presented in the court below to show that regional or local advertisers would be willing to pay greater fees because the sponsored program will be exhibited in some distant market, or that national advertisers would pay more for the relatively minor increase in audience size that CATV carriage would yield for a network program," and concluded that "[i]ndeed, economics and common sense would impel one to an opposite conclusion." 476 F. 2d, at 342 n. 2. Thus, no specific findings of fact were made concerning the precise impact of "distant" signal retransmission on the value of program copyrights. But such a showing would be of very little relevance to the copyright question we decide here. At issue in this

These shifts in current business and commercial relationships, while of significance with respect to the organization and growth of the communications industry, simply cannot be controlled by means of litigation based on copyright legislation enacted more than half a century ago, when neither broadcast television nor CATV was yet conceived. Detailed regulation of these relationships, and any ultimate resolution of the many sensitive and important problems in this field, must be left to Congress.[16]

---

case is the limited question of whether CATV transmission of "distant" signals constitutes a "performance" under the Copyright Act. While securing compensation to the holders of copyrights was an essential purpose of that Act, freezing existing economic arrangements for doing so was not. It has been suggested that the best theoretical approach to the problem might be "[a] rule which called for compensation to copyright holders only for the actual advertising time 'wasted' on local advertisers unwilling to pay for the increase in audience size brought about by the cable transmission," Note, 87 Harv. L. Rev. 665, 675 n. 32 (1974). But such a rule would entail extended factfinding and a legislative, rather than a judicial, judgment. In any event, a determination of the best alternative structure for providing compensation to copyright holders, or a prediction of the possible evolution in the relationship between advertising markets and the television medium, is beyond the competence of this Court.

[16] The pre-*Fortnightly* history of efforts to update the Copyright Act to deal with technological developments such as CATV was reviewed in the *Fortnightly* opinion, 392 U. S., at 396 n. 17. At that time legislative action to revise the copyright laws so as to resolve copyright problems posed by CATV was of such apparent imminence that the Solicitor General initially suggested to this Court that it defer judicial resolution of the *Fortnightly* case in order to allow a speedy completion of pending legislative proceedings. Those legislative activities, however, did not bear fruit, apparently because of the diversity and delicacy of the interests affected by the CATV problem. See 117 Cong. Rec. 2001 (1971) (remarks of Sen. McClellan). Further attempts at revision in the 91st Congress, S.

The judgment of the Court of Appeals is affirmed in part and reversed in part, and these cases are remanded to the District Court with directions to reinstate its judgment.

*It is so ordered.*

MR. JUSTICE BLACKMUN, dissenting in part.

I was not on the Court when *Fortnightly Corp.* v. *United Artists Television,* 392 U. S. 390 (1968), was decided. Were that case presented for the first time today, I would be in full agreement with what Mr. Justice Fortas said in dissent. I would join his unanswered—and, for me, unanswerable—reliance on Mr. Justice Brandeis' unanimous opinion in *Buck* v. *Jewell-LaSalle Realty Co.,* 283 U. S. 191 (1931). But *Fortnightly* has been decided, and today the Court adheres to the principles it enunciated and to the simplistic basis* on which it rests.

With *Fortnightly* on the books, I, like MR. JUSTICE DOUGLAS, would confine it "to its precise facts and leave any extension or modification to the Congress." *Post,* at 422. The United States Court of Appeals for the Second Circuit decided this litigation as best it could with the difficulties inherent in, and flowing from, *Fortnightly* and the Copyright Act, and within such elbowroom as was left for it to consider the expanding tech-

---

542, and the 92d Congress, S. 644, met with a similar lack of success. At present, Senate hearings in the Subcommittee on Patents, Trademarks and Copyrights have been held on a bill that would amend the Copyright Act, S. 1361, but the bill has not yet been reported out of that subcommittee. A companion bill has been introduced in the House of Representatives, H. R. 8186, and referred to Judiciary Committee No. 3, but no hearings have yet been scheduled.

* "Broadcasters perform. Viewers do not perform." 392 U. S., at 398 (footnotes omitted).

nology of modern-day CATV. Judge Lumbard's opinion, 476 F. 2d 338, presents an imaginative and well-reasoned solution without transgressing upon the restrictive parameters of *Fortnightly*. I am in agreement with that opinion and would therefore affirm the judgment.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE concurs, dissenting.

The Court today makes an extraordinary excursion into the legislative field. In *Fortnightly Corp.* v. *United Artists Television*, 392 U. S. 390, the lower courts had found infringement of the copyright, but this Court reversed, holding that the CATV systems in *Fortnightly* were merely a "reception service" and were "on the viewer's side of the line," *id.*, at 399, and therefore did not infringe the Copyright Act. They functioned by cable, reaching into towns which could not receive a TV signal due, say, to surrounding mountains, and expanded the reach of the TV signal beyond the confines of the area which a broadcaster's telecast reached.

Whatever one thinks of *Fortnightly*, we should not take the next step necessary to give immunity to the present CATV organizations. Unlike those involved in *Fortnightly*, the present CATV's are functionally equivalent to a regular broadcaster. TV waves travel in straight lines, thus reaching a limited area on the earth's curved surface. This scientific fact has created for regulatory purposes separate television markets.[1] Those whose tele-

---

[1] The Communications Act of 1934 empowered the FCC to "assign frequencies for each individual station," "determine the power which each station shall use," "[d]etermine the location of . . . individual stations," and "[h]ave authority to establish areas or zones to be served by any station." 47 U. S. C. §§ 303 (c), (d), and (h). Pursuant to these powers and others granted it by the Communications Act, the FCC has supervised the establishment and maintenance of

cast covers one market or geographic area are, under *Fortnightly*, estopped from saying that one who through CATV reaches by cable remote hidden valleys in that area, infringes the broadcaster's copyright. But the CATV's in the present cases go hundreds of miles, erect receiving stations or towers that pick up the programs of distant broadcasters, and carry them by cable into a wholly different area.

In any realistic practical sense the importation of these remote programs into the new and different market is performing a broadcast function by the cable device. Respondents in No. 72–1628 exercised their copyright privileges and licensed performance of their works to particular broadcasters for telecast in the distant market. Petitioners in that case (hereafter petitioners) were not among those licensees. Yet they are granted use of the copyrighted material without payment of any fees.

The Copyright Act, 17 U. S. C. §§ 1 (c) and (d), gives the owner of a copyright "the exclusive right" to present the creation "in public for profit" and to control the manner or method by which it is "reproduced." A CATV that builds an antenna to pick up telecasts in Area B and then transmits it by cable to Area A is *reproducing* the copyrighted work, not pursuant to a license from the owner of the copyright, but by theft. That is not " ' "encouragement to the production of literary [or artistic] works of lasting benefit to the world" ' " that we extolled in *Mazer* v. *Stein*, 347 U. S. 201, 219. Today's decision is at war with what Mr. Chief Justice Hughes, speaking for the Court in *Fox Film Corp.* v. *Doyal*, 286 U. S. 123, 130, described as the aim of Congress:

> "Copyright is a right exercised by the owner dur-
> ing the term at his pleasure and exclusively for his

---

a nationwide system of local radio and television broadcasting stations, each with primary responsibility to a particular community.

own profit and forms the basis for extensive and profitable business enterprises. The advantage to the public is gained merely from the carrying out of the general policy in making such grants and not from any direct interest which the Government has in the use of the property which is the subject of the grants."

The CATV system involved in the present cases performs somewhat like a network-affiliated broadcast station which imports network programs originated in distant telecast centers by microwave, off-the-air cable, precisely as petitioners do here.[2] Petitioners in picking up these distant signals are not managing a simple antenna reception service. They go hundreds of miles from the community they desire to serve, erect a receiving station and then select the programs from TV and radio stations in that distant area which they desire to distribute in their own distant market. If "function" is the key test as *Fortnightly* says, then functionally speaking petitioners are broadcasters; and their acts of piracy are flagrant violations of the Copyright Act. The original broadcaster is the licensor of his copyright and it is by virtue of that license that, say, a Los Angeles station is enabled lawfully to make its broadcasts. Petitioners receive today a license-free importation of programs from the Los Angeles market into Farmington, New Mexico, a distant second market. Petitioners not only rebroadcast the pirated copyrighted programs, they themselves—unlike those in *Fortnightly*—originate programs and finance their original programs [3] and their pirated programs by

[2] Farmington, New Mexico, into which petitioners pipe programs stolen from Los Angeles, is 600 miles away; and petitioners developed an intricate hookup "*via* twenty-three steps over a roundabout, 1300-mile route to [establish the link]." See 355 F. Supp. 618, 622.

[3] 476 F. 2d 338, 346–347; *CATV—First Report and Order*, 20 F. C. C. 2d 201; *United States* v. *Midwest Video Corp.*, 406 U. S.

sales of time to advertisers. That is the way the owner of these copyrighted programs receives value for his copyrights. CATV does the same thing; but it makes its fortune through advertising rates based in part upon pirated copyrighted programs. The Court says this is "a fact of no direct concern under the Copyright Act"; but the statement is itself the refutation of its truth. Re-channeling by CATV of the pirated programs robs the copyright owner of his chance for monetary rewards through advertising rates [4] on rebroadcasts in the distant area and gives those monetary rewards to the group that has pirated the program.

We are advised by an *amicus* brief of the Motion Picture Association that films from TV telecasts are being imported by CATV into their own markets in competition with the same pictures licensed to TV stations in the area into which the CATV—a nonpaying pirate of the films—imports them. It would be difficult to imagine a more flagrant violation of the Copyright Act. Since the Copyright Act is our only guide to law and justice in this case, it is difficult to see why CATV systems are free of copyright license fees, when they import programs from distant stations and transmit them to their paying customers in a distant market. That result reads the Copyright Act out of existence for CATV. That may or may not be desirable public policy. But it is a legislative decision that not even a rampant judicial activism should entertain.

There is nothing in the Communications Act that qualifies, limits, modifies, or makes exception to the Copy-

---

649. See also *Cable Television Report and Order,* 36 F. C. C. 2d 143, 148, 290; *Rules re Micro-wave Served CATV,* 38 F. C. C. 683; *Radio Signals, Importation by Cable Television,* 36 F. C. C. 2d 630.

[4] We sustained the Commission's authority to require CATV to originate programs in a 5–4 decision in 1972. *United States* v. *Midwest Video Corp., supra.*

right Act. "Nothing in this chapter contained shall in any way abridge or alter the remedies now existing at common law or by statute, but provisions of this chapter are in addition to such remedies." 47 U. S. C. § 414. Moreover, the Federal Communications Commission has realized that it can "neither resolve, nor avoid" the problem under the Copyright Act, when it comes to CATV.[5]

On January 14, 1974, the Cabinet Committee on Cable Communications headed by Clay T. Whitehead made its Report to the President. That Report emphasizes the need for the free flow of information in a society that honors "freedom of expression"; and it emphasizes that CATV is a means to that end and that CATV is so closely "linked to . . . electronic data processing, telephone, television and radio broadcasting, the motion picture and music industries, and communications satellites," *id.*, at 14, as to require "a consistent and coherent national policy." *Ibid.* The Report rejects the regulatory framework of the Federal Communications Commission because it creates "the constant danger of unwarranted governmental influence or control over what people see and hear on television broadcast programming," *id.*, at 20. The Report opts for a limitation of "the number of channels over which the cable operator has control of

---

[5] The Solicitor General in his memorandum in the *Fortnightly* case urged that the cable transmission of other stations' programs into distant markets be subject to copyright protection:

"[M]uch of the advertising which accompanies the performance of copyrighted works, such as motion pictures, is directed solely at potential viewers who are within the station's normal service area—'local' advertising and 'national spot' advertising both fall within that category. Such advertisers do not necessarily derive any significant commercial benefit from CATV carriage of the sponsored programs outside of the market ordinarily served by the particular station, and accordingly may be unwilling to pay additional amounts for such expanded coverage." Memorandum for the United States as *amicus curiae* in No. 618, O. T. 1967, p. 10.

program content and to require that the bulk of channels be leased to others." *Ibid.*

The Report recognizes that "copyright liability" is an important phase of the new regulatory program the Committee envisages, *id.*, at 39. The pirating of programs sanctioned by today's decision is anathema to the philosophy of this Report:

> "Both equity and the incentives necessary for the free and competitive supply of programs require a system in which program retailers using cable channels negotiate and pay for the right to use programs and other copyrighted information. Individual or industry-wide negotiations for a license, or right, to use copyrighted material are the rule in all the other media and should be the rule in the cable industry.

> "As a matter of communications policy, rather than copyright policy, the program retailer who distributes television broadcast signals in addition to those provided by the cable operator should be subject to full copyright liability for such retransmissions. However, given the reasonable expectations created by current regulatory policy, the cable operator should be entitled to a non-negotiated, blanket license, conferred by statute, to cover his own retransmission of broadcast signals." *Ibid.*

The Whitehead Commission Report has of course no technical, legal bearing on the issue before us. But it strongly indicates how important to legislation is the sanctity of the copyright and how opposed to ethical business systems is the pirating of copyrighted materials. The Court can reach the result it achieves today only by "legislating" important features of the Copyright Act out of existence. As stated by THE CHIEF JUSTICE in *United States* v. *Midwest Video Corp.*, 406 U. S. 649, 676,

"[t]he almost explosive development of CATV suggests the need of a comprehensive re-examination of the statutory scheme as it relates to this new development, so that the basic policies are considered by Congress and not left entirely to the Commission and the courts."

That counsel means that if we do not override *Fortnightly,* we should limit it to its precise facts and leave any extension or modification to the Congress.