**COX CABLE TUCSON, INC.,**
**Plaintiff-Appellant,**

v.

**David LADD, in his official capacity as Register of Copyrights, the Copyright Office, and United States of America, Defendants-Appellees,**

and

**Major League Baseball, Motion Picture Association of America, National Collegiate Athletic Association, National Basketball Association & North American Soccer League, and National Hockey League, Intervenors-Appellees.**

No. 85–2427.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 13, 1986.

Decided Aug. 1, 1986.

Brent N. Rushforth, R. Bruce Beckner, Washington, D.C., for plaintiff-appellant.

Thomas J. Byrnes, Dept. of Justice, Arthur Scheiner, Dennis Lane, Washington, D.C., for defendants-appellees.

Before ALARCON and WIGGINS, Circuit Judges, and STEPHENS,* District Judge.

## OPINION

ALARCON, Circuit Judge:

Plaintiff-appellant Cox Cable Tucson, Inc. (hereinafter Cox), the owner and licensed operator of a cable television system servicing Tucson, Arizona, sued defendants-appellees David Ladd (Register of Copyrights), the Copyright Office, and the United States of America (hereinafter collectively referred to as the Copyright Office) in the United States District Court for the District of Arizona on July 13, 1984. Cox sought a declaration that a regulation issued June 29, 1984 by the Copyright Office, 37 C.F.R. § 201.17(h)(9) (hereinafter the Regulation), is void as contrary to law. The Regulation concerns copyright royalty payments paid by cable television systems for distant broadcast television signals substituted for grandfathered distant signals. Cox hoped to avoid a higher royalty payment for three of its five signals by having the Regulation struck down.

On February 11, 1985, Cox filed a motion for summary judgment. The Copyright Office opposed Cox's motion and filed a cross-motion for summary judgment. On May 13, 1985, defendants-intervenors-appellees the Motion Picture Association of America, Inc., Major League Baseball, the National Basketball Association, the Na-

* Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

tional Collegiate Athletic Association, and the National Hockey League (hereinafter collectively referred to as the Program Suppliers) intervened in the action, opposed Cox's motion, and filed their own joint summary judgment motion. The Program Suppliers argued, *inter alia*, that Cox lacked standing to challenge the Regulation because it had not shown it was within the zone of interests to be protected or regulated by the Regulation. On July 11, 1985, the district court rejected the Program Suppliers' argument and found that Cox Cable had standing to pursue its action. The district court then denied Cox's summary judgment motion and granted the motion of the Copyright Office upholding the validity of the Regulation. Cox appeals.

We conclude that Cox lacks standing to challenge the Regulation. The challenged regulation concerns grandfathered signals. Cox has never provided the evidence necessary to establish that its signals were properly authorized or grandfathered. Because Cox has failed to show that it is "arguably within the zone of interests to be protected or regulated" by the Regulation, *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970), we reverse the summary judgment and remand to the district court with directions to dismiss the action for lack of standing.

## I. FACTS

### A. Historical Background of the Regulation

The cable television industry has grown rapidly since the first commercial systems were established in 1950. *See generally United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). A major use of cable technology "has been the retransmission of broadcast signals to areas beyond the reach of conventional 'over the air' facilities." *Nation-*

al *Cable Television Association, Inc. v. Copyright Royalty Tribunal*, 724 F.2d 176, 179 (D.C.Cir.1983) (hereinafter *NCTA*). This retransmission is known as distant signal retransmission. The Copyright Act of 1909, as construed by the Supreme Court, contained no provision for cable operators' copyright liability for distant signal retransmission. *Teleprompter Corp. v. CBS, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968).

Prior to 1966, the Federal Communications Commission (hereinafter FCC) did not regulate cable systems. In response to the continued growth of the cable industry, the FCC in 1966 adopted rules and regulations that permitted the carriage of distant signals only if such carriage was shown to be in the public interest. *First Report & Order in Docket Nos. 14895 & 15233*, 38 F.C.C. 683 (1965); 47 C.F.R. § 74.1107(a) (1966). The 1966 rules contained a grandfathering provision which permitted the continued carriage of distant signals that had been carried prior to the effective date of the rules (March 5, 1966). 47 C.F.R. § 74.1105(d), 74.1107(d) (1966).

In 1972, the FCC amended its regulations in several significant respects and promulgated distant signal and syndicated program exclusivity rules. *Cable Television Report & Order in Docket Nos. 18397, 18397-A, 18373, 18416, 18892 & 18894*, 36 F.C.C.2d 143 (1972). The distant signal rules restricted the number of distant broadcast signals a cable system was permitted to carry; the limit varied according to the size and signal density of the market within which the cable system operated.[1] *Id.* at 177–78; *NCTA*, 724 F.2d at 180. Like the 1966 rules, the 1972 rules contained a grandfathering provision which permitted the continued carriage of distant

---

1. In the top 50 television markets, cable systems were permitted to carry three network stations and three independents; in the second 50 markets, three networks and two independents; in the smaller markets, such as Tucson, three net- works and one independent. Two "bonus" independent signals were permitted in major markets where local signals filled the allotted cable complement. *Cable Television Report*, 36 F.C. C.2d at 177–78.

signals that had been carried prior to March 31, 1972. 47 C.F.R. § 76.65 (1972).[2]

In 1976, Congress decided to create a form of copyright liability for cable operators and established a cable compulsory license scheme. 17 U.S.C. § 111(d) (1976). The compulsory license scheme permitted licensed cable operators to carry whatever television programming the FCC rules permitted without negotiating with the copyright owner and without incurring liability for copyright infringement. In exchange for this privilege, however, Congress required cable operators to pay royalties for carriage of distant broadcast stations' non-network programming. 17 U.S.C. §§ 111(c)(1), (d)(2).[3] *See generally NCTA,* 724 F.2d 176 (discussing the Copyright Act of 1976, compulsory licensing, and related FCC rules). These compulsory license fees, paid by cable operators to the Copyright Office, are distributed to copyright owners by an independent agency, the Copyright Royalty Tribunal (hereinafter CRT) 17 U.S.C. §§ 111(d)(3)–(5), 801(b)(3).

The Copyright Act of 1976 sets initial fee schedules for cable carriage of distant broadcast signals, 17 U.S.C. § 111(d)(2)(B), (C), (D), and authorizes the CRT to make periodic adjustments to account for inflation and changes in the rates cable systems charge for their subscribers. 17 U.S.C. §§ 801(b)(2)(A), (D), 804(a). In addition, Congress authorized the CRT to adjust rates, in accordance with a reasonableness standard, in the event of changes in the FCC rules regulating cable system operation—specifically, alteration of the FCC's restrictive distant signal and syndicated program exclusivity rules. 17 U.S.C. § 801(b)(2)(B), (C).[4] However the CRT was

---

2. Section 76.65. Grandfathering Provisions:
    The provisions of §§ 76.57, 76.59, 76.61, and 76.63 shall not be deemed to require the deletion of any television broadcast or translator signals which a cable television system was authorized to carry or was lawfully carrying prior to March 31, 1972: *Provided, however,* That if carriage of a signal has been limited by Commission order to discrete areas of a community, any expansion of service will be subject to the appropriate provisions of this subpart. If a cable television system in a community is authorized to carry signals, either by virtue of specific Commission authorization or otherwise, any other cable television system already operating or subsequently commencing operations in the same community may carry the same signals. (Any such new system shall, before instituting service, obtain a certificate of compliance pursuant to § 76.11.)

3. The House Report explains why no fees were imposed for cable carriage of network and local non-network programming:
    The Committee determined ... that there was no evidence that the retransmission of "local" broadcast signals by a cable operator threatens the existing market for copyright program owners. Similarly, the retransmission of network programming, including network programming which is broadcast in "distant" markets, does not injure the copyright owner. The copyright owner contracts with the network on the basis of his programming reaching all markets served by the network and is compensated accordingly.
*House Judiciary Committee, Copyright Law Revision,* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 89, 90, U.S.Code Cong. & Admin.News 5659, 5704 (1976).

4. Title 17 U.S.C. § 801(b)(2)(B), on which the challenged Regulation rests, provides:
    (b) Subject to the provisions of this chapter, the purposes of the [Copyright Royalty] Tribunal shall be—

    (2) to make determinations concerning the adjustment of the copyright royalty rates in section 111 solely in accordance with the following provisions:

    (B) In the event that the rules and regulations of the Federal Communications Commission are amended at any time after April 15, 1976, to permit the carriage by cable systems of additional television broadcast signals beyond the local service area of the primary transmitters of such signals, the royalty rates established by section 111(d)(2)(B) may be adjusted to insure that the rates for the additional distant signal equivalents resulting from such carriage are reasonable in the light of the changes effected by the amendment to such rules and regulations. In determining the reasonableness of rates proposed following an amendment of Federal Communications Commission rules and regulations, the Copyright Royalty Tribunal shall consider, among other factors, the economic impact on copyright owners and users: *Provided,* That no adjustment in royalty rates shall be made under this subclause with respect to any distant signal equivalent or fraction thereof represented by (i) carriage of any signal permitted under the rules and regulations of the

not empowered to adjust rates, in response to such FCC action, for signals that cable operators could carry under FCC rules in effect on April 15, 1976. 17 U.S.C. § 801(b)(2)(B).

On July 22, 1980, the FCC adopted final regulations which eliminated both the distant signal and syndicated program exclusivity rules. *Report & Order in Docket Nos. 20988 & 21284*, 79 F.C.C.2d 663 (1980). The deregulation decision was upheld by the Second Circuit in *Malrite T.V. v. FCC*, 652 F.2d 1140 (2d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982).

In response to the FCC's action, the National Cable Television Association, the American Society of Composers, Authors and Publishers, and the Motion Picture Association of America petitioned the CRT to commence a rate adjustment proceeding. *See* 17 U.S.C. § 804(b). In that proceeding, the CRT determined that cable systems must pay 3.75% of their gross receipts from basic services for each 'distant signal equivalent' added as a result of the FCC's deregulation.[5] 47 Fed.Reg. 52146, 52155; 37 C.F.R. § 308.2(c), (d). The CRT's rate adjustments were upheld by the District of Columbia Circuit in *NCTA*, 724 F.2d 176. The 3.75% rate became effective on March 15, 1983.

In administering the compulsory license scheme and implementing the CRT's rate adjustments, the Copyright Office issued the Regulation challenged here. 37 C.F.R. § 201.17(h)(9) (1984).[6]

### B. Cox Cable

On March 21, 1966, the FCC received copies of four letters from TransVideo Corporation to the licensees of the four television stations in the Tucson area, notifying those broadcasters that TransVideo intended to carry four distant broadcast signals imported from Los Angeles (KTLA, KHJ–TV, KTTV, KCOP), and one distant signal from Phoenix (KPHO–TV) on its cable television system. On April 13, 1966, the FCC awarded a construction permit for a new commercial television station in Nogales, Arizona, whose predicted Grade B contour would cover Tucson. *International Broadcasting Co.*, 3 F.C.C.2d 449 (1966). TransVideo did not notify this new permittee of its intention to import distant signals. TransVideo never commenced operation in Tucson.

Cox began its cable operations in Tucson in September, 1982. Since commencing operations, Cox has carried two of the original five signals that it claims were grandfathered by TransVideo: KTTV and KTLA. Cox has not carried the other three purported grandfathered signals—KPHO–TV, KHJ and KCOP—but has carried three "substitute" signals—WTBS (Atlanta), WGN–TV (Chicago), and WOR–TV (New York).

Under the challenged Regulation, these "substitutes" are considered new signals added as a result of the FCC's deregulation, and are not treated as substitutes for the three grandfathered signals.

---

Federal Communications Commission in effect on April 15, 1976, or the carriage of a signal of the same type (that is, independent, network, or noncommercial educational) substituted for such permitted signal, or (ii) a television broadcast signal first carried after April 15, 1976, pursuant to an individual waiver of the rules and regulations of the Federal Communications Commission, as such rules and regulations were in effect on April 15, 1976.

**5.** "Distant signal equivalent" is defined in 17 U.S.C. § 111(f). In essence, that section provides that each distant independent station's signal counts as one distant signal equivalent (DSE), and the non-network programming of

each network station and each non-commercial educational station counts as one-quarter of a DSE. In general, a broadcast signal is "distant" if retransmitted by a cable system located more than 100 miles from the signal's point of origin.

**6.** The Regulation provides in pertinent part:

Substitution of like signals pursuant to 37 CFR 308(c)(2) is possible at the relevant non–3.75% rate ... only if the substitution does not exceed the number of distant signals which was or would have been allotted to the cable system under the FCC's television market quota for importation of network and nonspecialty independent stations.

37 C.F.R. § 201.17(h)(9) (1984).

## II. DISCUSSION

Cox filed suit challenging the validity of the Copyright Office's Regulation implementing the cable royalty requirements of 17 U.S.C. § 111 and § 801(b)(2)(B) in cases where a cable system 'substitutes' distant signals for other 'grandfathered' distant signals.[7] The Program Suppliers argued in their summary judgment motion below that Cox lacks standing to challenge the Regulation because it failed to demonstrate that it is "arguably within the zone of interests to be protected or regulated" by the Regulation. *Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970). The Program Suppliers claimed the signals which Cox assumes to be grandfathered are not in fact grandfathered because TransVideo failed to comply with the notice requirements of section 74.1105 of the FCC's former rules (deleted in 1971).

The order of the district court acknowledges the standing challenge, but simply states: "The Court finds that Cox Cable, Tucson, has standing." We disagree. Cox has presented no evidence to allow us to conclude that carriage of the substitute signals is grandfathered by virtue of the letters of notification sent pursuant to the provisions of former section 74.1105. We conclude the signals were neither authorized under section 74.1105 nor grandfathered under former section 76.65, and Cox, having failed to show the existence of grandfathered signals, lacks standing to challenge the Regulation.

Under former section 74.1105, if a cable operator gave proper and timely notification of intent to carry signals and the notification was unopposed, after thirty days following such notification those signals were authorized to the cable system. Former section 74.1105(a) provided in pertinent part:

No CATV system shall commence operations in a community or commence supplying to its subscribers the signal of any television broadcast station carried beyond the Grade B contour of the station, unless the system has given prior notice of the proposed new service to the licensee or permittee of any television broadcast station within whose predicted Grade B contour the system operates or will operate, and to the licensee or permittee of any 100 watt or higher power translator station operating in the community of the system, and has furnished a copy of such notification to the Federal Communications Commission, within sixty (60) days after obtaining a franchise or entering into a lease or other arrangements to use facilities; in any event, no CATV system shall commence such operations until thirty (30) days after notice has been given.

Cox's attempt to invalidate the Regulation begins with the assertion that "TransVideo Corporation [in 1966] took the required steps to 'grandfather' five distant signals for any cable system operating in Tucson." The parties agree that on March 21, 1966, the FCC received copies of four letters from TransVideo to Tucson area television stations notifying the stations pursuant to former section 74.1105 that it intended to import five distant signals. If TransVideo's March 21st notification had been proper, the right to carry the signals listed in that notification would have vested on April 20, 1966.[8] Because no opposition was filed with the FCC, Cox believes the five signals were authorized under section 74.1105 to be carried on April 20, 1966, and subsequently grandfathered under former section 76.65 (deleted in 1981).[9]

Section 74.1105 required that a cable system notify all licensees *and* permittees of television stations within whose Grade B contours it would operate. On April 13,

---

**7.** See *supra* footnotes 4 and 6 for the text of 17 U.S.C. § 801(b)(2)(B) and the Regulation.

**8.** The 30–day notice period runs from the date of FCC receipt of the notification letters, not the date of mailing as Cox appears to argue. *Great-*

*er Lawrence Community Antenna, Inc.,* 39 F.C.C.2d 935, 936 (1973).

**9.** See *supra* footnote 2 for text of 47 C.F.R. § 76.65.

1966, before any rights vested, the FCC awarded a construction permit for a new commercial television station in Nogales, Arizona. *International Broadcasting Co.,* 3 F.C.C.2d 449 (1966). The Program Suppliers submitted credible evidence to the district court showing that the predicted Grade B contour of this Nogales station covered the Tucson area in which TransVideo planned to operate. Under section 74.1105, TransVideo was required to notify the permittee of the Nogales station of its proposed service.

Cox did not submit any evidence of notification to the permittee of the Nogales station and conceded that none was given. Instead Cox argues that the notice requirement of section 74.1105 applied only to the licensees and permittees who were in existence on the first day of the 30–day notification period. Therefore, section 74.1105 did not require TransVideo to notify the Nogales station which was merely a permit applicant on March 21, 1966.

We reject Cox's argument that there was no continuing obligation under section 74.1105 to notify all parties specified in the rule throughout the entire 30–day period. The language of the section is clear: "No CATV system shall commence operations ... unless the system has given prior notice ... to the licensee or permittee of any television broadcast station within whose predicted Grade B contour the system operates or will operate ... in any event, no CATV system shall commence such operations until thirty (30) days after notice has been given." The broad language of section 74.1105 is not susceptible to Cox's narrow interpretation; there is no mention in the rule that a "single" or "initial" notification will satisfy the requirements.

Our interpretation of section 74.1105 is consistent with the purpose of the rule. In *Back Mountain Telecable, Inc.,* 5 F.C.C.2d 735 (1966), the FCC rejected a cable system's argument that substantial compliance with section 74.1105 satisfied the notice requirements. The FCC stated:

> Our CATV rules are designed to provide for orderly consideration of important public interest questions raised by CATV operations. Section 74.1105 is an integral part of such procedure, requiring the CATV to alert not only all stations which may be affected by its proposed operation but also the Commission at least 30 days prior to the commencement of service, so that appropriate action may be taken where such operation may be inimical to the public interest.

*Id.* at 740. The FCC concluded that the cable system was operating in violation of section 74.1105 and other rules and "that the public interest require[d] issuance of an order requiring [the cable system] to cease and desist from the unlawful operation of its CATV systems." *Id.* at 741. The FCC again emphasized the broader purpose of section 74.1105 in *Twin Cities Cable Co.,* 11 F.C.C.2d 267 (1968):

> Our CATV rules are designed for orderly consideration of important public-interest questions raised by CATV operations. Section 74.1105 and 74.1109 are integral parts of this regulatory program and provide an ad hoc procedure for resolution of distant signal questions in the smaller markets ... [T]hese rules require a CATV to notify all stations which may be affected by its proposed operation and, where a petition requesting relief from such operation is filed, to defer commencment of operation until the Commission, after consideration of the pleadings, determines whether the public interest would be served by the grant or denial of the request ... Taken together, sections 74.1105 and 74.1109 provide a combined procedure by which the Commission can accomplish its desired policy objective of having an opportunity to consider all public-interest questions raised with respect to a proposed CATV operation before such operation becomes an accomplished fact, and thus avoid the disruption to the CATV and to the public which would result if the cable service importing the challenged distant signals were instituted and later required to be

terminated after full consideration of the merits of the matter.

*Id.* at 271.

TransVideo's failure to notify the Nogales station was not a mere technical violation of FCC rules. The importance of notifying the Nogales permittee cannot be overstated: as the Tucson area's new and only independent station, i.e., not affiliated with a network, the Nogales permittee would have been the station most adversely affected by the heavy influx of distant independent stations from larger markets, and thus the most likely to have petitioned the Commission for a hearing on the propriety of TransVideo's operation.

■ While it is true that section 74.-1105 did not require that notice be given to applicants for construction permits, *David P. Mooney, D.B.A. Vicksburg Video, Inc.,* 17 F.C.C.2d 523, 524 (1969), the Nogales station became a permittee within the meaning of section 74.1105 on April 13, 1966, before TransVideo's rights vested. Furthermore, the FCC's public release of its permit grant to the Nogales station, *International Broadcasting Co.,* 3 F.C.C.2d 449 (1966), constituted notice to TransVideo of the grant to the Nogales permit. *See Report & Order in Docket No. 18802,* 23 F.C.C.2d 880, 885 (1970) (public releases constitute actual or constructive notice), *rev'd on other grounds,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974).

■ TransVideo's 1966 notification was defective because it failed to notify the permittee of the Nogales station. Because TransVideo failed to notify the permittee, the original five signals listed in its notification were never lawfully authorized. *Cf. Twin County Trans-Video, Inc.,* 7 F.C.C.2d 379 (1967) (applicant ordered to cease and desist unlawful operation of its cable system based on insufficient notification under 74.1105); *Back Mountain Telecable, Inc.,* 5 F.C.C.2d 735 (1966) (insufficient notification violated Rule 74.1105 and required an order to cease and desist from unlawful operation). TransVideo's failure to comply with the notification provisions of section 74.1105 precludes any determina-

tion that the carriage of these signals was grandfathered. *See, e.g., Cablevision Co. of Anniston,* 51 F.C.C.2d 9 (1975) (applicant's failure to comply with formal notification requirements under section 74.1105 precludes any determination that carriage of the signal is grandfathered); *Monterey Peninsula TV Cable,* 50 F.C.C.2d 809 (1975) (applicant's failure to comply with section 74.1105 precludes any determination that the signal is grandfathered since its carriage was never lawfully initiated); *Newport TV Cable, Inc.,* 49 F.C.C.2d 261 (1974) (applicant's admission that it failed to comply with former notification requirements precludes any determination that the carriage of the signals was grandfathered for they were never lawfully carried); *Crystal Cablevision, Inc.,* 48 F.C.C.2d 713 (1974) (because applicant never complied with section 74.1105 at any time prior to March 31, 1972, it was treated as a cable system that had not commenced operations prior to that date and its signals could not be grandfathered).

The FCC has never ruled that Cox Cable has any grandfathering rights. Under the procedures in effect at the time of TransVideo's attempted authorization, enforcement of section 74.1105 was through cease and desist procedures rather than affirmative approval. *Second Report & Order in Docket Nos. 14895, 15233 & 15971,* 2 F.C.C.2d 725, 766 (1966). Because TransVideo never commenced operations, the FCC had no need to enforce section 74.1105 with a cease and desist order. By the time Cox began its operation 16 years later, the FCC had deleted section 74.1105 and deregulated the cable industry.

Cox now claims that it has rights to grandfathered signals in Tucson but has never provided the evidence necessary to establish that TransVideo's five original signals were properly authorized or grandfathered. The challenged Regulation concerns grandfathered signals. Cox lacks standing to challenge the Regulation because it has failed to show that it is "arguably within the zone of interests to be protected or regulated" by the Regulation. *Association of Data Processing Service*

*Organizations, Inc. v. Camp,* 397 U.S. 150, 153–54, 90 S.Ct. 827, 829–30, 25 L.Ed.2d 184 (1970).

The district court erred in concluding Cox has standing in this action. We RE-VERSE the summary judgment and RE-MAND to the district court with directions to dismiss the action for lack of standing.