WGN CONTINENTAL BROADCASTING
COMPANY and Albuquerque Cable
Television, Inc., Plaintiffs,

v.

UNITED VIDEO, INC., Defendant.

No. 81 C 1320.

United States District Court,
N. D. Illinois, E. D.

Sept. 30, 1981.

Don Reuben, Reuben & Proctor, Chicago, Ill., for plaintiffs.

Alan Raywid, Washington, D. C., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge.

Plaintiff WGN Continental Broadcasting Company ("WGN") brought this action to enjoin defendant United Video, Inc. ("UVI") from retransmitting WGN's copyrighted television programming to UVI's cable television system customers after stripping the vertical blanking interval of WGN's TV signal of teletext information generated by WGN and substituting a Dow Jones News Service. In Counts I and IV of the complaint WGN claims, and UVI denies, that this is copyright infringement. In Counts II and III of the complaint the plaintiffs allege claims of tortious interference with contractual relations.

WGN has moved for a permanent injunction on Counts I and IV and UVI has moved for summary judgment on all counts. Based on the evidence heard and

received, and considering the memoranda filed by the parties, the court denies WGN's motion for permanent injunction and grants UVI's motion for summary judgment.

*The Parties*

WGN is an independent television broadcasting company, and UVI is a telecommunications common carrier, licensed to operate and regulated by the Federal Communications Commission ("FCC"). Under approval of the FCC, UVI has since November 9, 1978 provided satellite transmission service relaying WGN's TV signal to 1,400 cable systems throughout the United States which have a total of approximately 4.5 million subscribers.

UVI receives WGN's TV signal in Chicago, where it originates, relays it to a transmitting earth station in Wisconsin (an "uplink"), and from there transmits WGN's signal to a communications satellite.[1] From this satellite, UVI transmits the signal to at least 2,000 signal-receiving earth stations ("downlinks") across the United States. Through these earth stations, UVI makes WGN's signal available to cable television systems and other subscribers, who in turn distribute WGN's TV signal to the ultimate viewers for a fee.

The receiving cable systems are authorized by the FCC to receive and distribute the signal, for which they pay copyright fees to the owners of the programs' copyrights under a compulsory copyright license. UVI's customers pay UVI for its retransmission of WGN's TV signal.

WGN is not compensated by UVI or anyone for UVI's use of WGN's TV signal.[2] UVI has not sought, nor has WGN granted, WGN's permission to transmit or to sell WGN's signal. However, UVI is permitted by the FCC to carry WGN's signal, so long as it meets certain conditions. *United Video, Inc.*, 69 FCC 2d 1629, 1641 (1978). One of these conditions is that UVI is not permitted to be "substantially involved in the production of, the writing of, the selection of, or the otherwise influencing of the content of any information to be transmitted over its facilities."

*The Vertical Blanking Interval ("VBI")*

The video television picture is reproduced on a television set by an electron gun in the rear of the television receiver. The gun scans left and right across lines and then down on the television screen. (There are 525 lines on a standard set.) When the electron gun reaches the bottom of the screen, it shuts off briefly and returns to the top of the screen to repeat the process. The vertical blanking interval ("VBI") is that period of time and space in the transmission of television signals when the television picture is blank and while the electron gun is traveling from the lower right hand part of the screen to the top to begin another sequence of line by line transmission of picture information.

This time period is the equivalent of 21 scanning lines. The allotted time of twenty-one lines is set by FCC standard in its 525 line standardization for television transmission. The actual time for gun return is equivalent to nine lines (fourteen with older sets). Broadcasters have traditionally transmitted the essential information to "organize" the television picture in lines 1–9 of the VBI. The remaining lines are traditionally used for test signal generation on assigned lines with lines 15 and 16 unassigned and traditionally unused.

Each of the 21 lines in the VBI is or can be used for the following:

Lines 1–9 contain the sync pulses that direct vertical scanning;

---

1. UVI transmission facilities are leased for a substantial fee from Radio Corporation of America pursuant to RCA's tariff with the FCC. In order to maximize its leased satellite transponder space, UVI attempts to combine or multiplex as many different communications as it can over the same transmission path. In addition to WGN's TV signal, these communications include radio station WFMT (FM) Chicago, Seeburg Music Service, and the Dow Jones Alphanumeric Business News Service.

2. WGN would be compensated by cable television systems as a copyright owner of its own television programs under a compulsory licensing system created by the Copyright Act of 1976.

Lines 10–14 must be left blank to avoid picture interference on retrace in some TV receivers;

Lines 15 and 16, with emerging technology, can be used for subtitling programming, commercial enhancement, and teletext information;

Lines 17 and 18 are for test signals;

Line 19 contains the vertical interval reference signal;

Line 20 contains a transmitter control signal; and

Line 21 is presently reserved for closed captioning for the deaf.

The VBI is an integral part of WGN's television broadcast signal because television receivers could not function properly without it. Although only the first 14 lines of the VBI contain information important to the organization of the television program, the FCC standard is 25 lines. The entire VBI is essential to the transmission of the television picture to the television set. As WGN's expert testified:

To an engineer it is all one part of the same signal. One cannot exist without the other. It is an integral part of the signal.

However, the VBI in WGN's TV signal is not essential to UVI's retransmission of the signal to its customers. UVI, as a microwave and satellite common carrier, does not transmit directly to the ultimate television receiver, and vertical blanking is not integral to the television relay or transmission. It is more efficient and economical for UVI to strip the VBI from WGN's TV signal before transmitting the signal to the satellite, and that is what UVI has been doing. However, since the VBI is essential to television reception, the VBI must be reinserted into the signal before the signal is distributed to the cable television systems. Therefore, UVI reinserts the VBI before making the signal available to its cable system customers. UVI puts its own information on lines 1–9 of the VBI and its own test signals on lines 17–18. Although UVI had been stripping WGN's closed captioning for the deaf on line 21, UVI intends to reinsert that captioning in the VBI. The stripping of the VBI, described above, does not adversely affect the quality of the transmission of WGN's broadcast signal.

With increasingly sophisticated technology, it has become possible to broadcast more and more information in the VBI.[3] Many broadcasters are exploring further commercial use of the VBI, specifically for teletext. Teletext involves the use of lines 15 and 16 of the VBI to provide viewers with information such as train schedules, weather, advertising, financial news, and television program schedules. Teletext programming is becoming successful in England and Canada.

Television receivers must be equipped with special decoders to translate information broadcast in the VBI into visual images. Some of the uses, like closed captioning for the deaf, require only one television receiver. Other uses, such as for teletext, require two receivers, one to display the teletext and a second to display traditional television programming.

*The Battle for the VBI*

In December 1980, WGN applied to the FCC for temporary experimental authority to transmit material on lines 10–16 of the VBI of WGN's TV signal. Part of the experiment involved the plaintiff Albuquerque Cable Television, Inc., a subsidiary of WGN. WGN's application to the FCC stated in part:

WGN further proposes to establish experimental receiving equipment at selected locations throughout the signal coverage area of WGN–TV. Since the WGN–TV signal is distributed by satellite throughout the United States to cable television systems, WGN is in a unique position to experiment with the feasibility of widespread signal distribution in the vertical blanking interval of a broadcast

---

**3.** Presently, the most common new use of the VBI is to provide closed captioning (subtitles) to assist hearing-impaired viewers. Closed captioning is ordinarily carried on line 21 of the VBI, and appears as subtitles at the bottom of the TV screen on specially equipped television sets.

television signal. WGN plans to place experimental receivers in homes in Chicago, Illinois area and also in areas distant from Chicago, such as Albuquerque, New Mexico, or other communities which receive the WGN–TV Channel 9 signal by satellite transmission or other means. Albuquerque, New Mexico is the site of a cable system owned and operated by Albuquerque Cable Television, Inc., a subsidiary of WGN Continental Broadcasting Company. Albuquerque thus provides an ideal location for controlled experimentation with signal reception.

Under the proposed experimental authorization, WGN intends to check the feasibility of sending various kinds of text and data to many different areas served by the WGN broadcast signal. The program material to be transmitted will consist of news items, business data, sports scores, feature materials, broadcast schedules and other materials intended to provide a full range of test data.

On December 18, 1980, the FCC granted WGN the authorization "to perform teletext program tests, as requested."

At the time of this application WGN did not know that UVI was stripping the VBI from the WGN–TV signal. Obviously, if WGN's data in the VBI is stripped, the teletext material generated by WGN would not be retransmitted to Albuquerque.

Commencing on February 10, 1981, WGN broadcast teletext in lines 15 and 16 of the VBI of its television signal pursuant to the FCC authorization. Shortly before WGN began broadcasting teletext material, WGN discovered that UVI was stripping WGN's VBI when it retransmitted WGN's signal. WGN advised UVI that WGN was going to transmit information to Albuquerque, New Mexico pursuant to its FCC authorization and demanded that UVI stop stripping WGN's VBI. UVI refused and, as a result, WGN's teletext program has not been received in Albuquerque.

On February 5, 1981, UVI filed a revised tariff with the FCC seeking authorization to offer a Vertical Interval Service on its communications satellite facilities. UVI's initial revised tariff filing described the service as follows:

United Video, Inc. is instituting a new service offering to allow common carrier customers to make use *of the vertical blanking interval in the WGN–TV broadcast transmission.* (The blanking interval is that which separates each "frame" of a television picture and permits the picture tube circuitry to instruct the electron beam to return to the top corner of the screen for the start of a new "frame.") *This blank space in the WGN signal,* if translated to a television screen, would be at least four lines wide. It is feasible to insert encoded data in this broadcast interval to allow the use of point-to-point data transmission without in any way affecting the picture or picture quality. ("Closed captioned" subtitles for the deaf are transmitted by this means.) (Emphasis supplied.)

The next day the FCC routinely granted the request, advising though, that "the granting of the request is not to be construed as approval by the Commission." Prior to seeking FCC authorization, UVI extensively tested teletext.

WGN had no notice of the FCC proceeding, and it is clear from the evidence that UVI endeavored to keep WGN uninformed of UVI's plans. UVI was rushing to establish what one of its officers called "squatters rights" on the VBI in WGN's TV signal.

Beginning February 26, 1981 UVI has transmitted a 24-hour Dow Jones news service in the VBI of WGN's TV signal after stripping WGN's teletext information. The ability to strip WGN's teletext material was essential to the Dow Jones undertaking. Before embarking on the venture, UVI assured Dow Jones "that we had equipment on site at the uplink that could strip out any data WGN might decide to put on the vertical interval."

The battle for the VBI was on. It would be fought not in traditional terms, such as

who owns the VBI, but in copyright terms.[4] The battle would also be fought under a law which was enacted before technology permitted the use of the VBI to transmit teletext material.

*The Copyright Issues*

In Counts I and IV of the complaint, WGN alleges that UVI's stripping of WGN's VBI infringes WGN's copyright in two 9:00 News programs, the February 12, 1981 9:00 News which contained experimental material in the VBI, and the April 23, 1981, 9:00 News which contained a news story and program schedule in the VBI. WGN has registered and is claiming a single copyright for each of the 9:00 News programs and the teletext material transmitted in the VBI of the signal that carried the 9:00 News programs.

The Copyright Act of 1976 gives the owner of a copyright of an audiovisual work the exclusive right to publicly perform or display the copyrighted work. 17 U.S.C. § 106(4) and (5). WGN, therefore, as the owner of the copyright on its own programs has the exclusive right to transmit them to the public.

The copyright questions arising out of the retransmission of television signals and copyrighted programs were first addressed by the Supreme Court and later by Congress. Under the 1909 copyright law, the retransmission of a television broadcast to the public by a cable television system was not considered to be a "performance" and, therefore, not copyright infringement. *Teleprompter Corp. v. Columbia Broadcasting System, Inc.*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974); *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968). These decisions are discussed at various places later in this opinion. Both decisions urged Congress to consider and determine the scope and extent of any such liability in the then pending copyright revision bill. In 1976 Congress enacted a substantially revised copyright law and in Section 111 of the Copyright Act of 1976 dealt with the subject of retransmissions.

The operative terms of Section 111 are "primary transmission" and "secondary transmission." They are defined in relation to each other as follows:

A "primary transmission" is a transmission made to the public by the transmitting facility whose signals are being received and further transmitted by the secondary transmission service, regardless of where or when the performance or display was first transmitted.

A "secondary transmission" is the further transmitting of a primary transmission simultaneously with the primary transmission ... 17 U.S.C. § 111(f).

Principally, Section 111 provided for a compulsory licensing system under which cable television systems pay royalties to the owners of the copyrights of the television programs retransmitted by the cable systems. Section 111(a) also provided that certain kinds of secondary transmissions do not constitute copyright infringement of primary transmissions embodying a performance or a display of a work. Four exemptions are provided for in Section 111(a). The exemption set forth in Section 111(a)(3) is the only exemption that is at issue in this case. It provides in relevant part that:

[T]he secondary transmission of a primary transmission embodying a performance or display of a work is not an infringement of copyright if ...

\*     \*     \*     \*     \*     \*

---

4. WGN has an appealing equitable case based on the simple fact that without WGN's broadcast, which is "taken" by UVI without compensation, UVI would not be transmitting the Dow Jones news service. While UVI technically would be able to transmit the Dow Jones news service, it probably would not be economical to do so. Clearly UVI is economically benefitted by the use of WGN's VBI. Before this case began, the President of WGN wrote to UVI and asserted: "We regard the vertical blanking interval of the WGN–TV signal as the exclusive property of WGN–TV." However, WGN's equitable and property rights are not relevant to the copyright issues before the court. They should be relevant considerations for the FCC in deciding UVI's authority to retransmit WGN's signal or approving UVI's application to use the VBI of WGN's signal.

(3) The secondary transmission is made by any carrier who has *no direct or indirect control over the content or selection of the primary transmission* or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cables, or other communications channels for the use of others . . . .

17 U.S.C. § 111(a) (emphasis supplied).

The parties call this the "passive carrier exemption." The legislative history is clear that this exemption protects only passive carriers of television signals:

The general exemption under section 111 extends to secondary transmitters that act *solely* as *passive* carriers. Under clause (3), a carrier is exempt if it "has no direct or indirect control over the content or selection of the primary transmission. . . ."

S.Rep.No.94–473, 94th Cong., 1st Sess. (1975) at 78; H.R.Rep.No.94–1476, 94th Cong., 2d Sess. (1976) at 92 (emphasis supplied), U.S.Code Cong. & Admin.News 1976, p. 5659, 5706.

WGN has taken the position that UVI's secondary transmission of WGN's copyrighted 9:00 News programs and the sale thereof to UVI's cable television system customers constitutes a copyright infringement unless UVI establishes that it is a passive carrier under § 111(a)(3). WGN further asserts that UVI is not a passive carrier because of its activities with respect to the VBI of WGN's TV signal.

UVI's position is that its secondary transmission of WGN's programming is not a copyright infringement because it transmits only to cable television systems and not the public. Next UVI asserts that if its retransmission does constitute an infringement, it is entitled to the passive carrier exemption. Finally, UVI argues that the teletext program is separate from WGN's copyrighted 9:00 News programs, and the failure to retransmit the teletext program does not violate WGN's copyright of its 9:00 News programs.

*The Passive Carrier Exemption*

The first question the court will consider is whether UVI is entitled to the passive carrier exemption. In connection with this issue, there is substantial disagreement between the parties as to what constitutes a primary transmission and control over or selection of a primary transmission for purposes of Section 111(a)(3).

WGN argues that the primary transmission is its television signal, that the stripping of any part of the signal constitutes control of the primary transmission, and that UVI's substitution of the Dow Jones news service constitutes selection of the primary transmission.[5] In contrast, UVI argues that the primary transmission consists of WGN's television programs, that the stripping of the VBI has no effect on the broadcast of those programs, that the VBI is not part of the programs, and, therefore, that UVI is not controlling or selecting the primary transmission.

It is interesting to note that in other parts of Section 111, Congress used the concepts which WGN and UVI urge as the proper interpretation of Section 111(a)(3). In Section 111(b) a particular kind of secondary transmission is not an infringement if, among other things, "the signal of the primary transmitter is not altered or changed in any way by the secondary transmitter . . . ." This is similar to WGN's proposed interpretation of Section 111(a)(3). In Section 111(e)(1)(B) certain other kinds of secondary transmissions are not infringements if, among other things, "the copyrighted program, episode, or motion picture videotapes . . . is transmitted without deletion or editing . . . ." This is close to what UVI urges as the meaning of Section 111(a)(3). Instead of using one of these

---

**5.** This argument goes beyond WGN's original complaint that UVI was infringing two specific copyrighted 9:00 News programs. If WGN is correct that the stripping of the VBI of WGN's TV signal constitutes control of the primary transmission, then UVI could never insert the Dow Jones news service in the VBI, even when it is blank. This is the ultimate position urged by WGN in its memoranda.

descriptive statements, however, in Section 111(a)(3) Congress referred to control over or selection of the primary transmission, which easily could mean either alteration of the signal or editing of the program.

With respect to the first part of the puzzle, is the primary transmission the signal or the program, the parties point to the definitions of primary transmission and secondary transmission and the use of certain words in other parts of Section 111. None of these arguments is persuasive. For example, UVI relies on the definition of "primary transmission" quoted above. However, the definition is not helpful because it refers both to a transmitting facility whose "signals are being received and further transmitted" and also to the "performance or display . . . transmitted."

WGN in turn relies on the reference to "carriage of a television broadcast signal" in the definition of secondary transmission in Section 111(f). The reference, however, appears in a proviso which makes the non-simultaneous further transmission of a primary transmission by a cable system located in Hawaii a secondary transmission "if the carriage of the television broadcast signal comprising such further transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission." A similar reference is contained in Section 111(b), which deals with secondary transmission to the public of primary transmissions which are made for reception only by controlled groups. Congress provided that the secondary transmission is not actionable as an act of infringement if, among other things, the carriage of the "signals comprising the secondary transmission" is required under the rules, regulations or authorizations of the FCC, and the "signal of the primary transmitter is not altered or changed in any way by the secondary transmitter."

In both of these sections, however, Congress probably referred to the transmission of signals permitted or required by the FCC simply because the FCC regulates the retransmission of "signals" and Congress wanted to be sure that the secondary transmission was at least authorized, and in certain instances required, by the FCC.[6] So these references in the Act to "signals" are far from conclusive.

Finally, WGN relies on a reference to signals in the legislative history of the Act, but the reference is made in connection with Section 111(a)(1) which creates an exemption for secondary transmission by the management of a hotel, apartment house, or similar establishment, "of signals transmitted" by a licensed broadcast station. This exemption was discussed in the House Report as follows:

> The exemption would not apply if the secondary transmission consists of anything other than the *mere relay of ordinary broadcasts.* The cutting out of advertising, the running in of new commercials, or *any other change in the signal relayed would subject the secondary transmitter to full liability.*

H.R.Rep. No. 94–1476, *supra,* as summarized in 17 U.S.C.A. at 168 (emphasis supplied). In this paragraph, the House Report refers to both the "relay of ordinary broadcasts" and the "signal relayed." The reference to signals is not surprising since Section 111(a)(1) specifically refers to "signals transmitted." Moreover, the legislative history of this section has no direct bearing on Section 111(a)(3).

The court concludes that Congress did not consider the primary transmission to be the signal separate from the program or vice versa, but rather treated the program and the signal as inseparable. The Supreme Court in *Fortnightly* and *Teleprompter* similarly used "signal," "broadcast" and "program" interchangeably. For example,

---

**6.** See, for example, the discussion of FCC regulations applicable to cable television systems in *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). Also, in Section 111(b) Congress deemed it necessary to add the concept that the "signal cannot be altered or changed" so that it was clear that the signal was not "unscrambled" so that it could be transmitted to the public. H.R. Rep.No.94–1476, *supra,* as summarized in 17 U.S.C.A. at 168.

in *Teleprompter* the Court stated that a cable television system makes a choice as to which "signals" to retransmit and thereafter it simply carries without editing whatever "programs" it receives. *Teleprompter Corp. v. CBS, supra*, 415 U.S. 394 at 410, 94 S.Ct. 1129 at 1139, 39 L.Ed.2d 415. It would be artificial to decide this case on a finding based on the language of the Act and its legislative history that Congress intended the primary transmission to be the signal without the program or the program without the signal.

The term "primary transmission" as used in Section 111(a)(3) should be interpreted in such a way that it has copyright significance. In creating exemptions for copyright liability in Section 111(a), Congress expressly referred to "primary transmissions embodying a performance or a display of a work." The reference to "primary transmission" in subpart (3) of Section 111(a) easily could be read as a reference to a "primary transmission embodying a performance or a display of a work." Under this reading of the statute, UVI would be exempt so long as it does not "control" or "select" the copyrighted 9:00 News programs broadcast by WGN.

This reading makes sense textually and is consistent with the theory and purpose of copyright laws. As UVI argues, the copyright laws are designed to protect intellectual property, not methods of communica-tion. Although Congress could have created an exemption for carriers on a number of grounds, including a requirement that the carrier not alter or change the broadcaster's signal, it is far more likely that Congress would impose copyright liability on a carrier based on activity that has significance in the copyright context.[7]

■ Activity which changes the content of the copyrighted work clearly has copyright significance. On the other hand, mere alteration of the signal which does not affect the retransmission of the broadcaster's copyrighted work has no copyright significance.[8] Thus, interpreting "primary transmission" in Section 111(a)(3) to mean "primary transmission embodying the performance or display of a work" would make the denial of the exemption from copyright liability depend on activity which has copyright significance. (Notably, the Supreme Court ultimately treated the retransmissions at issue in *Fortnightly* and *Teleprompter* as the retransmission of the copyrighted work.) Therefore, the court holds that the "primary transmission" as used in Section 111(a)(3) means the copyrighted work which is initially broadcast and retransmitted.

The next question is whether UVI's activities constitute control over or selection of the primary transmission.[9] In this case the

---

7. The concept that the retransmitter's activities which cause it to be an infringer should directly relate to the retransmisison of the copyrighted work comes from the Supreme Court's decision in *Teleprompter Corp. v. CBS, Inc., supra*. In that case, the television broadcaster of copyrighted programs argued that the cable television system was engaging in activities which, under the "passive test" developed by the Supreme Court in *Fortnightly*, pushed the cable television system over the line and made it more like a broadcaster and hence liable for copyright infringement. These activities included, among other things, origination of its own programs and insertion of local advertising. The Court decided that these activities were not relevant because "in none of these operations is there any nexus with the cable television system's reception and rechanneling of the broadcaster's copyrighted materials." 415 U.S. 394, at 405, 94 S.Ct. 1129, at 1136, 39 L.Ed.2d 415. The Court viewed these activities as "simply extraneous to a determination of copyright infringement liability with respect to the reception and retransmission of broadcasters' programs." *Id.*

8. Changes in the television signal by the cable television system which did not affect the content of the copyrighted program were deemed irrelevant for copyright purposes by the Supreme Court in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 399 n.27, 88 S.Ct. 2084, 2089 n.27, 20 L.Ed.2d 1176.

9. The control and selection test was developed by the Supreme Court in *Fortnightly* and *Teleprompter*. Although both of those cases dealt with cable television systems and not carriers, it is likely that Congress was applying a similar test to carriers in Section 111(a)(3). Although Congress rejected the result of the cases and made cable television systems subject to a compulsory licensing system, Congress did not

primary transmissions at issue are two 9:00 News programs broadcast by WGN at approximately the same time WGN was transmitting teletext programs. WGN registered each news program and the teletext program transmitted during the same time period as a single copyright.

WGN argues that UVI's deletion of any part of a copyrighted program constitutes control over or selection of the primary transmission. The court agrees. If the teletext program and the 9:00 News program properly constitute a single copyrighted audiovisual work, then UVI's deletion of the teletext portion of the work should result in UVI's loss of the passive carrier exemption with respect to the secondary transmission of that program. In this multi-media age, it should not matter, as UVI argues, that it takes two television sets to receive the audiovisual work. It also should not matter that at the present time very few television sets are equipped with the decoder necessary to receive teletext programs. The transmission of teletext is still made to the public. Broadcasters transmit their signals indiscriminately to the public to be received by those members of the public having the necessary receiving equipment. As a precedent, color transmissions initially could only be received by a relatively few television sets, but the transmissions were available to the public and soon became popular.

UVI contends, however, that in each of the two instances at issue, WGN's teletext program and its 9:00 News program are not a single audiovisual work and are not properly copyrighted under a single copyright.

"Audiovisual works" are defined in the Copyright Act of 1976 as:

> Works that consist of *a series of related images* which are intrinsically intended to be shown by the use of machines or devices such as projectors, viewers, or electronic equipment, together with accompanying sounds, if any, regardless of the nature of the material objects, such as films or tapes, in which the works are embodied. 17 U.S.C. § 101. (Emphasis added.)

Thus, the Act contemplates one copyright for each "series of related images." The statute follows the early cases holding that motion pictures could be copyrighted as one "photograph" based on the fact that a motion picture "is, in substance, a single photograph, . . . shown by the fact that its value consists in its protection as a whole or unit . . . ." *Edison v. Lubin*, 122 F. 240 (3d Cir. 1903), *appeal dismissed*, 195 U.S. 625, 25 S.Ct. 790, 49 L.Ed. 349 (1904); *see also American Mutoscope & Biograph Co. v. Edison Manufacturing Co.*, 137 F. 262 (C.C.D.N. J.1905).

■ There are three required elements for an audiovisual work:

> It must consist of (1) "images"; (2) such images must be sequential, that is, they must be "related" and presented in a "series"; (3) such images must be capable of being shown by a machine or device. 1 *Nimmer on Copyright*, § 209[A] (1980).

WGN's claim that its news program *plus* its teletext transmissions constituted one copyrighted work fails under this test. The teletext transmission simply was not part of the 9:00 News program; they were not intended to be viewed together as a single work by the same viewer at the same time. The teletext transmission did not constitute part of the same "series of related images" which made up WGN's regular news program. WGN transmitted two audiovisual works on each night at issue: the 9:00 News program without teletext and the teletext program.

■ WGN suggests that a teletext program may be related to the regular television program and "if all WGN has to do is relate teletext to WGN's television programming . . ., that day will soon come." Based on the successful use of teletext in Canada and England, it does appear that WGN's day will come and broadcasters will commercially transmit regular programming and teletext as a single copyrighted work. But that is not this case.

reject the Court's analysis. In any event, these cases continue to be instructive as to what constitutes control over or selection of the primary transmission.

Since the 9:00 News program and the teletext program are separate and distinct audiovisual works, they may not properly be the subject of a single copyright. UVI's activities in stripping the teletext program do not interfere with or even relate to the secondary transmission of WGN's copyrighted 9:00 News program. With respect to the 9:00 News, all UVI does is receive and retransmit it, without editing, to its various cable television system customers throughout the country. This kind of activity by a cable television system was considered "passive" by the Supreme Court in *Fortnightly.* The Court stated (392 U.S. 390 at 400, 88 S.Ct. 2084 at 2089, 20 L.Ed.2d 1176):

> The function of CATV systems has little in common with the function of broadcasters. CATV systems do not in fact broadcast or rebroadcast. Broadcasters select the programs to be viewed; CATV systems simply carry, without editing, whatever programs they receive. Broadcasters procure programs and propagate them to the public; CATV systems receive programs that have been released to the public and carry them by private channels to additional viewers.

Even when the cable television system engaged in such activities as program origination, insertion of advertising, interconnection with other cable television systems, and the selection of a distant signal over numerous closer signals, the Supreme Court held in *Teleprompter* that so long as those activities did not relate to or affect the receipt and retransmission of the broadcaster's copyrighted programs which were allegedly infringed, the activities had no copyright significance. The Court viewed the activities as "simply extraneous to a determination of copyright infringement liability with respect to the reception and retransmission of broadcasters' programs." *Teleprompter Corp. v. CBS, supra,* 415 U.S. 394 at 405, 94 S.Ct. 1129 at 1136, 39 L.Ed.2d 415.

Similarly, having held that the 9:00 News program and the teletext program are not the same copyrighted work, UVI's deletion of the teletext program and insertion of the Dow Jones news program are extraneous to a determination of copyright infringement with respect to UVI's secondary transmission of the 9:00 News programs.

On this analysis the court holds that UVI's activities in stripping WGN's VBI (whether blank or used for teletext material) and UVI's insertion of the Dow Jones news service do not constitute control over or selection of WGN's 9:00 News programs, the primary transmissions at issue in this case. Therefore, UVI is entitled to the benefit of the passive carrier exemption of Section 111(a)(3).

*The Public Performance Requirement*

The remaining copyright issues before the court are issues raised by UVI's defense that even if it is not entitled to the passive carrier exemption, it is not guilty of copyright infringement because it does not transmit the teletext program at all, and none of its secondary transmissions are to the public. Although the court's decision that UVI is entitled to the passive carrier exemption with respect to WGN's 9:00 News programs renders these issues moot, the court will decide them as an alternative ground of decision.

There is no dispute that a secondary transmission of copyrighted programs constitutes a "performance" for copyright purposes. Although there are textual difficulties in the Copyright Act of 1976, 2 *Nimmer on Copyright* § 8.18[B] at 8–197, the legislative history of the Act clearly indicates that Congress intended to include a retransmission in the concept of a "performance." *Orth-O-Vision, Inc. v. Home Box Office,* 474 F.Supp. 672, 685 (S.D.N.Y.1979).

However, the performance must be public. The legislative history of the Copyright Act clarifies the necessity for performances or displays to be "public" as a prerequisite to an infringement action:

> Although any act by which the initial performance or display is transmitted, repeated, or made to recur would itself be a "performance" or "display" under the bill, it would not be actionable as an infringement unless it were done "public-

ly," as defined in section 101. H.R.Rep. No. 94–1476, 94th Cong., 2d Sess. 63 (1976), U.S.Code Cong. & Admin.News 1976, p. 5677.

The definition of "publicly" in § 101 of the Act reads as follows:

> To perform or display a work "publicly" means—(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or (2) to transmit or otherwise communicate a performance or display of the work to a place specified in clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times. 17 U.S.C. § 101.

The relevant part of the definition under the facts in this case is: "To perform or display a work 'publicly' means ... to transmit ... to the public ...."

■ UVI's first argument is that even treating the teletext material as a separate copyrighted work, and UVI's deletion of that program and substitution of the Dow Jones news service as a selection of the primary transmission, it nevertheless is not guilty of infringing any copyright on the teletext program because it does not transmit that program. The court agrees. The activity which might constitute the "selection" of a primary transmission only results in the loss of the exemption; it does not create copyright liability. In the absence of a performance of the copyrighted work, there can be no infringement.

UVI's failure to transmit the teletext program may have significance to the FCC because UVI's license is conditioned on its not being substantially involved in the selection of the information transmitted over its facilities. But that is not an issue in this case.

■ UVI's final argument, that all else failing it cannot be liable as an infringer because it does not transmit to the public,

also is correct. UVI transmits to its customers, principally cable television systems, which in turn transmit to the public. UVI does not directly transmit to the public.

The FCC has authorized UVI to operate as a communications common carrier or resale satellite carrier "for the purpose of point-to-multipoint distribution of television and associated audio signals of [WGN]." United Video, Inc., 69 FCC2d 1629, 1639 (1978). The difference between broadcasting and point-to-point transmission, which is not broadcasting, is described by the Court of Appeals in *CBS v. Teleprompter Corp.*, 476 F.2d 338, 343 n.6 (2d Cir. 1973).

UVI has no authority to distribute WGN's TV signal to individual viewers or members of the public. That distribution is performed by the cable systems, which in turn must obtain FCC authorization for such distribution. UVI's license to transmit WGN's TV signal prohibits service to any cable television system which does not have FCC authorization to distribute the transmitted signal. *Id.* 69 FCC 2d at 1641–42. The cable television systems authorized by the FCC to receive and distribute WGN's TV signal pay copyright fees to the U.S. Copyright Office pursuant to a compulsory copyright license for distribution of WGN programming to their subscribers.

The subscribers of cable television systems are clearly the "public." See 17 U.S.C. § 111(f):

> A "cable system" is a facility ... that in whole or in part receives signals transmitted or programs broadcast by one or more television broadcast stations licensed by the Federal Communications Commission, and makes secondary transmissions of such signals or programs by wires, cables, or other communications channels to *subscribing members of the public* who pay for such service. (Emphasis added.)

The cable television systems to which UVI transmits, although numerous (more than 1400), are not the "public" and UVI's transmissions to these systems are not transmissions to the public. The cable systems are not viewing WGN's programming,

but distributing the programming to the public. It is not UVI's transmission which reaches the public, but the cable television systems' transmission.[10]

It is true that without UVI these cable systems would not be able to transmit WGN's programming to the public, but UVI is only an intermediary in the distribution chain. The retail distributors, the cable television systems, pay royalties because they distribute to the public. If the wholesaler, UVI, was also liable for copyright infringement, it would also be liable for royalties. That would result in a double payment but the number of ultimate viewers would remain the same.

WGN points out that members of the public are now capable of picking up satellite transmissions by use of homemade satellite receiving dishes. See, for example, TIME Magazine, "Earth Stations: Sky in the Pie," September 7, 1981, at page 70. WGN argues that this makes UVI's satellite transmissions just as much "in the air" as those of a television broadcaster. There are significant differences between UVI and a broadcaster. Transmission to home satellite receiving dishes is not part of UVI's business and such transmissions are not intended by UVI nor authorized by the FCC. UVI receives no commercial benefit from such transmissions. (In contrast, television broadcasters put their signals in the air for the general use of the public but they sell advertising time to advertisers.) Under these circumstances, the fact that some members of the public can receive the satellite transmissions does not turn UVI's transmissions into transmissions to the public for copyright purposes.

Finally, WGN argues that a holding that carriers do not transmit to the public would render meaningless the passive carrier exemption of Section 111(a)(3). The Section 111(a)(3) exemption probably was necessary because of the Act's broad definition of a "secondary transmission" in Section 111(f)

which seems to encompass the mere carrier function. If a carrier is not entitled to the exemption, however, there is nothing in the Act which would eliminate for purposes of making carriers liable for copyright infringement the requirement that the transmission be to the public. In the absence of any such explicit provision in the Act, the court will not read the "public" requirement out of the Act.

The court, therefore, holds that UVI is not transmitting to the public and even if it were not entitled to the passive carrier exemption, it would not be guilty of infringement of WGN's copyrights.

*Tortious Interference with Plaintiffs' Contractual Relations and Expectancies*

■ Plaintiffs have alleged tortious interference with contract and economic expectancy claims. Counts II and III of the complaint. Plaintiffs state that they "filed these claims to show the Court that UVI's unlawful acts have damaged more than WGN's copyright rights." However, UVI has not committed any unlawful acts and its activities in stripping WGN's teletext program do not constitute tortious interference with plaintiffs' contract or expectancy rights.

The contract or expectancy rights alleged by plaintiffs are based on an experiment involving the broadcast of teletext which WGN and one of its subsidiaries, Albuquerque Cable Television, Inc., wanted to conduct. The experiment is described in WGN's application to the FCC which is quoted above in the section of this opinion entitled "The Battle for the VBI."

A lengthy discussion of Illinois law is not necessary. Plaintiffs' claims under Counts II and III of the complaint fail because their contract or expectancy depended upon UVI's transmission of the teletext program from Chicago to Albuquerque and UVI had no legal obligation to transmit the program

---

10. The two transmissions are distinct. The *secondary transmissions made by cable systems* to their subscribers are necessarily entirely different transmissions than those which UVI transmits to cable systems. Cable systems must process the transmissions received from UVI and retransmit them in a different form in order to be viewable by their subscribers on ordinary television receivers.

without being paid for its services by the plaintiffs.[11] Two parties cannot contract between themselves to accomplish a goal which cannot be achieved without a third party's services which are available for hire, not hire those services, and then complain that the third party's failure to provide the services constituted a tortious interference with their contract. On the uncontroverted facts before the court, plaintiffs' claims in Counts II and III must fail.

*Conclusion*

For the reasons stated in this opinion, the court hereby orders that WGN's motion for a permanent injunction is denied and UVI's motion for summary judgment on all counts of the complaint is granted. The case is dismissed.

**11.** In this case, even if UVI's stripping of the teletext program violated WGN's copyright rights, that violation would not compel UVI to transmit the teletext material. If there was a copyright violation, UVI could be enjoined from transmitting the 9:00 News program without the transmission of the teletext program, but there still would be no legal obligation to transmit in the first instance. It may be that UVI's license from the FCC requires that UVI transmit the teletext program, but this has not been asserted by the plaintiffs.