**EASTERN MICROWAVE, INC.,**
**Plaintiff,**

v.

**DOUBLEDAY SPORTS, INC., Defendant.**

**No. 81–CV–303.**

United States District Court,
N. D. New York.

March 12, 1982.

Bond, Schoeneck & King, Syracuse, N. Y., and Dow, Lohnes & Albertson, Washington, D. C., for plaintiff; Charles T. Beeching, Jr., M. Catherine Richardson, New York City, John D. Matthews, Arnold P. Lutzker, Charles H. Helein, Washington, D. C., of counsel.

Hancock, Estabrook, Ryan, Shove & Hust, Syracuse, N. Y., and Arnold & Porter, Washington, D. C., for defendant; Robert J. Hughes, Benjamin J. Ferrara, David E. Peebles, Syracuse, N. Y., David H. Lloyd, Leonard H. Becker, Robert Alan Garrett, Vicki J. Divoll, Robert N. Weiner, Washington, D. C., of counsel.

## MEMORANDUM–DECISION AND ORDER

McCURN, District Judge.

This matter is before the Court on the parties' cross motions for partial summary judgment. The issues to be decided are: (1) whether Eastern Microwave's retransmissions of WOR–TV telecasts, more particularly WOR's broadcasts of the Mets' games, are public performances within the meaning of 17 U.S.C. § 106; and (2) whether Eastern Microwave is exempt from copyright liability for those retransmissions, if they are found to be public performances, by virtue of the exception set out in 17 U.S.C. § 111(a)(3). For the reasons set forth below, plaintiff's motion for partial summary judgment is denied; defendant's motion for partial summary judgment is granted.

## BACKGROUND

Plaintiff Eastern Microwave, Inc. [EMI], a Syracuse based corporation, is licensed by the Federal Communications Commission [FCC] to act as a communications common carrier. *See* 47 U.S.C. § 214.[1] At least part of the business conducted by EMI is the retransmission of television signals via microwave and satellite transmission to Community Antennae Television [CATV], or cable, systems in the Northeast and across the country. EMI retransmits approximately 16 different television signals. The controversy in this case centers on the retransmission of one of those signals, WOR–TV, broadcast from New York City.

Plaintiff has been retransmitting the WOR signal, either by microwave relay or by satellite, or both, since 1965. To this date, WOR has not objected to EMI's transmission of its signal. One of the copyright owners of a program broadcast by EMI has, however, objected to the retransmission of its copyrighted work, the defendant Doubleday Sports, Inc.[2]

Defendant Doubleday is the owner of the New York Mets, a National League baseball team. Each year Doubleday contracts with WOR for the broadcast of approximately 100 Mets' games per season.[3] At the beginning and conclusion of each game broadcast, the following disclaimer is read by the broadcaster:

> This copyrighted telecast is authorized under television rights granted by the New York Mets solely for the entertainment of our audience. Any publication, reproduction or use of the pictures, descriptions and accounts of this game without the express written consent of

the New York Mets is prohibited. Any commercial or other use of the program, such as by charging admission for its showing, is similarly prohibited.[4]

EMI has never requested, nor has Doubleday ever granted to EMI, permission to retransmit the Mets' games to its CATV customers. It is this retransmission without consent that Doubleday alleges infringes its rights under the Copyright Act, 17 U.S.C. §§ 101–702.

Doubleday first informed EMI of its objection to EMI's retransmission of the Mets' games on March 27, 1981. By letter, Doubleday gave notice to EMI that Doubleday viewed any retransmission by EMI of the Mets' games scheduled for broadcast in the month of April to be an infringement of Doubleday's copyright interest in those broadcasts.[5] Doubleday also sent a telegram to EMI restating the message. The following month, Doubleday once again sent a letter and confirming telegram stating its objection to any retransmission by EMI of the Mets' games. This letter and telegram set forth the games to be telecast by WOR–TV in the month of May. EMI, however, continues to retransmit the WOR–TV signal without deleting the Mets' games. On April 3, 1981, EMI filed suit in this Court seeking a judicial declaration that its retransmissions of the Mets' games do not infringe on any copyright interest held by defendant. Doubleday subsequently brought this motion for partial summary judgment declaring, pursuant to Rules 56 and 57 of the Fed.R.Civ.P., plaintiff's retransmissions not exempt from infringement by virtue of the exceptions to the

---

1. The definition of common carrier is set forth in 47 U.S.C. § 153 as follows: " 'Common carrier' or 'carrier' means any person engaged as a common carrier for hire, in interstate or foreign communications by wire or radio. . . ."

2. EMI argues that, under common law notions, Doubleday may not be the owner of the copyright in the games broadcast by WOR–TV. The Court need not decide this issue, however, as there exists a contract between WOR–TV and Doubleday reserving the copyright interest in the games broadcast to Doubleday Sports, Inc.

3. Doubleday has contracted with other entities to broadcast Mets' games, other than those telecast by WOR.

4. This disclaimer is read in the past tense at the conclusion of the game.

5. There is no dispute in this case that these games, if "fixed", i.e. recorded simultaneously, are copyrightable.

Copyright Act contained in § 111(a)(3) and dismissing plaintiff's complaint for declaratory judgment in accordance therewith. EMI thereafter cross moved for partial summary judgment seeking denial of defendant's motion and affirmative judgment for plaintiff.

EMI originally alleged that it was exempt from copyright liability because its retransmissions were within the exception set out in 17 U.S.C. 111(a)(3) for carriers. EMI later amended its complaint to set forth its further contention that it was not liable for copyright infringement because it does not perform the retransmissions publicly, as required by 17 U.S.C. § 106. It is the opinion of the Court that neither of these arguments is availing.

## DISCUSSION

*Public Performance*

Pursuant to the Copyright Act, the owner of a copyrighted work has the exclusive right to perform that work publicly. 17 U.S.C. § 106. Therefore, in order for this Court to find that EMI is infringing Doubleday's copyright in the Mets' games broadcast over WOR–TV, it must first be determined that EMI's retransmission of the games to its CATV customers constitutes a public performance.

■ The definition of a public performance is set forth in 17 U.S.C. § 101, which states in pertinent part:

To perform or display a work "publicly" means—

(1) to perform or display it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

Here, the parties do not dispute the EMI "performs" the WOR broadcasts of the Mets' games;[6] the question is whether it does so publicly.

The recipients of EMI's retransmissions of the WOR telecasts are approximately 600 CATV systems across the country, and two hotels located in Las Vegas, Nevada.[7] As

6. EMI retransmits the WOR signal by two methods, microwave point to point relay and by satellite.

As described in plaintiff's memorandum of law, a microwave relay system consists of a series of terrestrial microwave radio stations using towers or other high structures. The structures are located on high mountain peaks or other unobstructed sites which permit line-of-sight interference-free signal transmission to each other, on frequencies allocated and licensed by the F.C.C. Using a string of microwave stations, television signals, once converted to microwave signals, are relayed over long distances. Ultimately, the microwave signal is transmitted to the CATV receiving antenna or headend, where it is fed into electronic signal processing equipment by the CATV operator. The frequency is then reconverted to a television frequency and delivered to the CATV subscribers. Pl. Mem. at 7.

Satellite retransmission allows the carrier to carry the transmission to farther distances more economically. Again, as described by plaintiff in its memorandum, EMI transmits the WOR signal via satellite by first picking up the

WOR signal "off the air" at its antenna in Highland Lakes, New Jersey. EMI then transmits the signal to the satellite's earth station transmitting site in Vernon Valley, New Jersey. Here, the signal of WOR is transmitted to the satellite by use of an "up-link" or ten meter parabolic dish. The signal is then relayed to Earth and is collected at an earth receive station, or "down-link", owned by EMI's CATV customers. The CATV operator then reconverts and delivers the signal in the same manner as when the signal is relayed by microwave. Pl. Mem. at 9–10.

7. The parties, in their arguments to the Court have, interestingly enough, not focused on the differences between a CATV system and the hotels, as relates to the public performance requirement and the availability of the exception in § 111(a)(3). However, because it is the opinion of this Court that EMI's retransmissions to the CATV systems are not excepted from liability under § 111(a)(3) and that these are public performances, the rationale of this opinion, although not directed to the hotels, is intended to include the transmissions to the hotels.

described in more detail in n. 6, the CATV systems receive the EMI retransmission at a headend, or receiving antenna. The headends are not places open to the public. These retransmissions, therefore, are not to the public within the meaning set forth in clause one of section 101. It appears to this Court, however, that these retransmissions are public within the meaning of clause two of that section, that is, EMI "transmit[s] or otherwise communicate[s] a performance... *to the public....*" 17 U.S.C. § 101 (emphasis added).

It is EMI's position that "public" as used in this portion of section 101 refers solely to members of the viewing public. Therefore, it contends that its transmissions to CATV systems are not transmission to the public because the CATV systems do not view the programs transmitted, they merely alter the signal received and transmit it to their subscribing members. It is the subscribing members that EMI asks this Court to view as the "public", thereby making EMI's transmissions non-public performances. This Court does not agree.

There is no evidence that in drafting this definition, Congress intended the word "public" to be construed so narrowly. *See, e.g.,* H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 64–65, *reprinted in* [1976] U.S.Code Cong. & Ad.News, 5659, 5679–5680.[8] Had Congress intended the "public" to be limited to members of the viewing public, it could easily have limited the definition. Such is not the case. In the absence of such intention on the part of Congress, this Court is not willing to narrow this definition. EMI's CATV customers are themselves members of the public.[9] The retransmissions of the Mets' games by EMI are, therefore, public performances.

The parties have cited, and the Court has found, only one published opinion involving the meaning of "public" within 17 U.S.C. §§ 101, 106. *WGN Continental Broadcasting Co. v. United Video, Inc.*, 523 F.Supp. 403 (N.D.Ill.1981). In that case, Judge Getzendanner held that satellite retransmissions to CATV system "headends" were not performances to the public within the meaning of 17 U.S.C. §§ 101, 106. There the Court stated that:

> [i]t is true that without UVI [the carrier] these cable systems would not be able to transmit WGN's programming to the public, but UVI is only an intermediary in the distribution chain. The retail distributors, the cable television systems, pay royalties because they distribute to the public. If the wholesaler, UVI, was also liable for copyright infringement, it would also be liable for royalties. That would result in a double payment but the number of ultimate viewers would remain the same.

8. In commenting upon this exception, the Senate Committee stated in its report that:
   > Clause (2) of the definition of "publicly" in section 101 makes clear that the concepts of public performance and public display include not only performances and displays that occur initially in a public place, but also acts that transmit or otherwise communicate a performance or display of the work to the public by means of any device or process. The definition of "transmit"—to communicate a performance or display "by any device or process whereby images or sound are received beyond the place from which they are sent"—is broad enough to include all conceivable forms and combinations of wired or wireless communications media, including but by no means limited to radio and television broadcasting as we know them. Each and every method by which the images or sounds comprising a performance or display are picked up and conveyed is a "transmis-

sion," and if the transmission reaches the public in any form, the case comes within the scope of clauses (4) or (5) of section 106. H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 64–65, *reprinted in* [1976] U.S.Code Cong. & Ad. News, 5659, 5679–5680.

9. It is not disputed that the CATV systems are customers of EMI. EMI's Domestic Resale Satellite Communications Services Tariff, F.C.C. No. 11 at page 6 states that "Customer is *any member of the public* who directly orders or orders and receives communications services offered or provided by Carrier [EMI]." (Emphasis added). Further, EMI's CATV Service Agreement states that "WHEREAS EASTERN MICROWAVE, INC. is a common carrier licensed by the Federal Communications Commission to engage in *furnishing to the public,* video and audio program transmission service...." (Emphasis added).

*Id.* at 415. The Court further stated that an interpretation of the term "public" which would include the CATV systems, would, in effect, read the public requirement out of the Act. *Id.* This Court does not agree. Rather, to limit the meaning of public to the viewing public without express direction from Congress would be to read a narrow interpretation of public *into* the Act. Therefore, it is the determination of this Court that EMI does publicly perform the copyrighted works of Doubleday Sports, within the meaning of 17 U.S.C. §§ 101, 106.

*Exception*

■ Not all public performances of copyrighted works constitute copyright infringement. The Act contains certain limitations on the exclusive right to public performance. The limitation relevant here is found in 17 U.S.C. § 111(a)(3), which provides that:

> [t]he secondary transmission of a primary transmission embodying a performance or display of a work is not an infringement of a copyright if—
>
> (3) The secondary transmission is made by any carrier who has no direct or indirect control over the content or selection of the primary transmission or over the particular recipients of the secondary transmission, and whose activities with respect to the secondary transmission consist solely of providing wires, cable, or other communications channels for the use of others. . . .

*Id.*[10] In this case, the primary transmission is the signal broadcast by WOR–TV; the secondary transmission is the retransmission of the WOR signal by EMI to its CATV customers. EMI argues that it has no control over the content or selection of the primary transmission or over the recipients of the secondary transmission and that its activity is limited to providing wires, etc. Doubleday contends that EMI does not come under this exception. This Court finds the position of Doubleday more convincing.

The first requirement for this exception to be effective is that the carrier have no control over the content or selection of the primary transmission, in this case the signal of WOR–TV. Based on the record before the Court, it appears that EMI does not exercise control over the content of WOR–TV programming. It does, however, exercise control over the selection of the primary transmission.

It was EMI which selected WOR's signal to be retransmitted to the public. The decision to retransmit WOR by satellite relay was made after EMI had conducted a survey to determine the marketability of the WOR signal. Originally, EMI had planned to transmit two television signals via satellite, WOR and WSBK, broadcast from Boston. EMI was only able to contract for one channel over the satellite, therefore, it had to select between the two already selected for the one signal to be retransmitted. Based on the demand for WOR–TV demonstrated by EMI's survey, EMI selected the WOR signal. It is clear that EMI selected the primary transmission.

EMI argues that this Court should hold that no selection has been made by EMI because the sole reason EMI selected WOR's signal is EMI's inability to retransmit every television signal broadcast in the country. EMI urges that the technical im-

---

**10.** Primary and Secondary transmissions are defined in 17 U.S.C. § 111(f) as follows:

A "primary transmission" is a transmission made to the public by the transmitting facility whose signals are being received and further transmitted by the secondary transmission service, regardless of where or when the performance or display was first transmitted.

A "secondary transmission" is the further transmitting of a primary transmission simultaneously with the primary transmission, or nonsimultaneously with the primary trans-

mission if by a "cable system" not located in whole or in part within the boundary of the forty-eight contiguous States, Hawaii, or Puerto Rico: Provided, however, That a nonsimultaneous further transmission by a cable system located in Hawaii of a primary transmission shall be deemed to be a secondary transmission if the carriage of the television broadcast signal comprising such further transmission is permissible under the rules, regulations, or authorizations of the Federal Communications Commission.

possibility of transmitting every tv signal forced EMI to choose one signal. Therefore, it was necessity, or technical impossibility, that selected the WOR signal. This Court finds this argument to be without merit.

EMI also exercises control over the recipients of the secondary transmission, the CATV systems. It is EMI which chooses the customers with which it will deal. EMI contends that the subscribing members of the CATV systems, the viewing public, are the recipients of the secondary transmission and that EMI has no control over these recipients.[11] EMI only carries the secondary transmission to the CATV headends, however. The signal received by the subscribing members is transmitted by the CATV systems themselves. Therefore, the recipients of the secondary transmission carried by EMI are the CATV systems, not their subscribing members.[12]

Assuming, arguendo, that EMI did not exercise control over the selection of the primary transmission or the recipients of that transmission, this exception would still not be available to EMI for its activity is not limited to providing wires, cables, or other communications channels, for the use of others, as required by section 111(a)(3).[13]

It is true that EMI makes its service available by providing these avenues of communication. It does not, however, provide them solely for the use of others. Rather, they are used to make available the product it is marketing, WOR–TV.

In its brief, EMI likens itself to carriers such as AT&T, which do provide wires, etc., for the use of others. EMI contends that as the activities of AT&T would, in many

cases, come under the exception contained in section 111(a)(3), so should this activity of EMI.[14] In connection with this contention, EMI has filed with the Court numerous examples of AT&T advertising campaigns, the similarity of which to EMI advertisements it urges places EMI in *pari causa* with AT&T. There is, however, at least one major difference between AT&T and EMI. AT&T markets its services; EMI markets a product.

The advertisements demonstrate that EMI is doing more than providing cables, etc., for the use of others. It is selling a product, the signal of WOR–TV. While AT&T makes its services available to anyone desiring to transmit a communication from one point to another, EMI only offers the communication it is marketing. EMI, therefore, is using the facilities it makes available for its own marketing, not for use by others. It is not the fact that EMI advertises that causes EMI to lose the exemption set forth in this section. It is the fact that the advertisements demonstrate that EMI is, itself, using the wires, etc., it makes available, in contravention of the requirement set forth in 17 U.S.C. § 111(a)(3).

The Court having determined that EMI performs the copyrighted works of the defendant publicly, and that the exemption contained in 17 U.S.C. § 111(a)(3) is not available to EMI, it is hereby

ORDERED, ADJUDGED AND DECREED that plaintiff's motion for partial summary judgment declaring plaintiff's transmissions exempt from infringement is denied and defendant's motion for partial

---

**11.** It appears from at least one of the documents filed in this case that EMI might control some of the recipients of the signal as delivered by the CATV systems. EMI's Customer Service Order provides that "The cable system will not have the right to extend the service to other customers without Eastern's permission. Eastern shall grant such permission at tariff rates."

**12.** As described, *supra* at n. 6, the signal received by the subscribing members is not the same signal retransmitted by EMI. The CATV operator must reconvert EMI's signal into a

frequency which can be received by the subscribing member.

**13.** H.R.Rep.No. 94–1476, 94th Cong., 2d Sess. 92, *reprinted in* [1976] U.S.Code Cong. & Ad. News, 5706, states that for this exception to be available, the carrier must be "passive".

**14.** It would appear from the legislative history that section 111(a)(3) was impliedly, if not specifically, designed to provide exemption to carriers such as AT&T. Pl. Mem. at 40–50; Def. Memo. at 45–55.

summary judgment dismissing the complaint is granted.

IT IS SO ORDERED.